**ALCOA STEAMSHIP COMPANY, Inc.,**
Libelant,

v.

**CHARLES FERRAN & COMPANY, Inc.,**
et al., Respondent.

**Admiralty No. 3390–B.**

United States District Court
E. D. Louisiana,
New Orleans Division.

April 22, 1965.

---

1. See 22 La.Law Review 214 (1961)

Joseph M. Rault, Benjamin W. Yancey, Edward S. Bagley, Francis Emmett and Terriberry, Rault, Carroll, Yancey & Farrell, New Orleans, La., for libelant.

George B. Matthews, George A. Frilot, III, and Lemle & Kelleher, New Orleans, La., for Charles Ferran & Co., Inc., and others, respondent.

Leon Sarpy, James G. Burke, Jr., and Chaffe, McCall, Phillips, Burke, Toler & Hopkins, New Orleans, La., for other respondents.

FRANK B. ELLIS, District Judge.

This libel has been brought by the Alcoa Steamship Company, Inc., a corporation organized and existing under the laws of the State of New York, as owner of the S/S ALCOA CORSAIR, against respondent Charles Ferran & Company, Inc., a Louisiana Corporation domiciled in the City of New Orleans and engaged in the business as a ship repair contractor, and Ferran's liability underwriters, that is, respondents Glens-Falls Indemnity Company, a New York corporation, Underwriters at Lloyds, London, Andrew Weir Insurance Company, Inc., Fine Art and General Insurance Company, Ltd., National Provincial Insurance Company, Lets., Orion Insurance Company, Ltd., English and American Insurance Company, Let. "M", and Economic Insurance Company, Ltd.

The libel is for the recovery of one million dollars plus, resulting from the fire on the CORSAIR caused by the allegedly negligent repairs to the starboard boiler done by Ferran in an alleged breach of the implied warranties in the undertaking.

The case was tried in Court and on depositions on the question of liability vel non. After having carefully analyzed briefs and rebuttal briefs submitted by proctors for all parties, and, after an even more careful analysis of the evidence and exhibits submitted the Court now makes the following findings of fact and conclusions of law on the question of liability.

The S/S ALCOA CORSAIR was constructed, at the instance of the United States Maritime Commission, in Portland, Oregon, at the end of World War II. Subsequent negotiations transferred the ownership of the vessel, while under construction, to the Aloca Steamship Company, Inc.. She was completed, with some modifications, in 1946–47 and began her life in the admiralty.

The CORSAIR was a modified Victory Ship, designed for transportation of both cargo and passengers. She was four hundred and sixty five feet long by sixty five feet in beam and manned by its crew of some one hundred men. She served the shippers and residents of the Gulf States area from 1947 until October 1956, trading on a rum-and-romance run be-

tween Mobile, New Orleans, and a number of the ports of the Carribean Sea.

The CORSAIR was driven by a single propeller which was powered by a steam turbine engine. Steam for the propulsion machinery and auxiliary equipment was supplied by two (port and starboard) high pressure boilers located in the fire room on the hold deck, at the forward lower level of the engine spaces, which are located in the amidship area of the vessel.

The CORSAIR'S boilers are her initial power source, and their functioning at maximum efficiency is vital to the mechanical operation of the entire ship. To obtain the intense heat essential for generating steam, each boiler, operating on a combustion principle, burns a mixture of air and pre-heated oil.

A system of piping adjoining each boiler circulates black bunker oil through a heating system. When the fuel has reached a temperature of about 230 degrees F., the re-circulating valve is closed and the oil is held under pressure in a header or manifold pipe located on the upper outer casing of the boiler front. For the oil to move from the header into the interior or fire box of the boiler, where it is ignited, it must flow *through an upper coupling*, down through a dropline, and then through a lower coupling and lower valve into a burner which is inserted in a burner barrel, where it is *atomized and sprayed into the arch of* the fire box. On each boiler there are four identical burner positions, commonly referred to as registers. The boiler may be fired at one or more, or all, of the registers.

The mischievous device giving rise to this million dollar libel for damages is that coupling mentioned in italicized print in the preceding paragraph.

To operate the boilers, air, driven by the forced air blower, is introduced into the fire box through the space between the casings and then through the registers. The forced draft blower is a fan located several levels above the fire room but operated by a wheel valve from the fire room. It blows air into the opening between the inner and outer casing walls of the boiler beneath the floor plate level so that the air is forced under pressure through the ventilator blades of the registers between the casings. From the blades the air flows into the fire box.

On each boiler there are four registers, arbitrarily numbered from forward to aft one through four. The end registers, one and four, are situated at a higher level than are the middle registers, two and three. Each register is actually a circular housing for air ventilator blades. The register is bolted flush against the outer wall or casing of the boiler, and the fuel carrying burner barrel, to which the dropline is connected, passes through its center. In this way, the two combustible elements, oil and air, are introduced into the fire box at the same point.

Ignition of the oil-air mixture is effected by the use of a simple torch, pushed through the peephole located on the face of the register, just above the burner barrel assembly. This ignition phase of operation follows the clearing phase in which the forced draft blower is first used, before insertion of the torch, to expel from the fire box any residual fumes which might have accumulated there.

It is well to note, at this juncture, that the position of the droplines in relation to their respective registers is such that it is mechanically impossible to remove the register without removing the dropline, removal of which is effected by disconnecting both the upper and lower fittings.

The interior of the boilers, that is, the fire box, has walls and flooring of fire-brick. On the inner front wall there are four arches made of tile, surrounding the aperture where each register sits. Periodic maintenance repair of this brick and tile work is necessary for efficient steam generation.

Because of the pre-heated oil used under pressure, and because of the steam produced, great care is required at all

stages of working with the boilers: at construction, at operation and certainly at every repair.

The constant maintenance which a ship requires is best handled when one reliable ship repairer does all or nearly all of the work. With this in mind, Alcoa came to an informal understanding with Charles Ferran & Company, Inc., that the latter should handle the repairs to the COR-SAIR when she was in her base port of New Orleans. Even during the building of the CORSAIR, the then vice-president and general manager of Ferran, A. N. Kreihs, had gone to the construction site at Portland, Oregon, in order to familiarize himself with her characteristics. This general understanding bound neither party to perform; at any time Alcoa could have employed another New Orleans repairer, and Ferran was free to refuse to work on the CORSAIR.

Rather than a general contract, there was a series of individual contracts whereby Ferran worked on a cost-plus or time-and-material basis. And it was on this basis that Ferran had made from time to time virtually all the repairs to the CORSAIR, including necessary boiler work, from the time she went into service until the repair of the fire damage, which is the subject of this litigation.

There were no other terms in these individual contracts, with the exception of a "Red-Letter" clause. In order that proper attention may be focused on this clause, it is here quoted in full:

"We contract only upon the following terms, applicable to every contract; in the case of a vessel we have a lien upon the vessel for our bills; all time contracts are subject, without responsibility on our part, to delay in case of strike, labor difficulties, fire or causes beyond our control; or liability in case of defective workmanship or material is limited strictly to the proper replacement thereof.

"Furthermore, we undertake to perform work on vessels and provide berth, wharfage, towage and other services and facilities only upon condition that we shall not be liable in respect to any one vessel, directly or indirectly in contract, tort or otherwise, to its owners, charterers or underwriters for any injury to such vessel, its cargo, equipment or movable stores, or for any consequences thereof, unless such injury is caused by our negligence or the negligence of our employees and in no event shall our aggregate liability to all such parties in interest for damage sustained by them, as a result of such injury, exceed the sum of $300,-000.00.

"In connection with the accident and/or indemnity and/or insurance clauses, if any, contained in your specifications, relating to liability for personal injuries, please note that we do not agree to same, in so far as they undertake to impose any liability or any obligation to take out or maintain insurance beyond the liabilities or the obligations to insure imposed upon us by law."

Alcoa asserts without serious contestation, and the court finds, that in a typical instance an individual contract was made and performed in the following manner. Initially, work was assigned to Ferran by Alcoa, either by telephoning work items in broad outline or by sending brief, undetailed memoranda. Upon arrival of the vessel, Louis Tavan, the Ferran superintendent in charge of work on Alcoa ships, boarded the ship, inspected the items to be repaired, and thereafter prepared rough specifications for each of these items. Upon completion of the work, Tavan rewrote the specifications to conform with actual work, and these "rewrites", with prices itemized, were then sent to Alcoa. If it agreed to the prices, Alcoa then typed Ferran's rewritten specifications on an Alcoa job order form and sent this to Ferran. Shortly after the ship in question had sailed, Ferran mailed Alcoa an invoice listing the cost of each item.

Alcoa admits that on October 31st, twenty-six days following the fire, an

invoice was transmitted covering the work in question which embraced the red-letter clause, Ferran exhibit #13. Apparently subsequent billings on numerous Alcoa vessels contained the red-letter clause. In addition to exhibit #13 Ferran has proved that prior billings contained the clause, exhibits Ferran #7 through #12. It is true that the applicability of this clause has never been tested since no loss has ever occurred which exceeded the $300,000 limitation.

Ferran counters, and this court agrees, that both parties were fully aware of the practice in the trade, and further that Alcoa made no objection, and no one connected with Alcoa did anything to indicate their intention to exclude the red-letter clause in this particular case or any other until the New York contract of October 8, 1956. Under the usages of the trade, the exhibits and the evidence, the clause was in force and effect in this case. The applicability of the clause is further borne out by the witnesses, the most significant of which is Alcoa's Superintendent of Engineering, Lyndon L. Watts, who represented Alcoa and negotiated repair contracts with Ferran, and who testified that he knew that the red-letter clause was on the invoices and had seen it several times prior to 1956. Apparently Watts had read the clause on this and several other repair contractors' invoices prior to October of 1956 and was familiar with the fact that it had been used in the trade.

This Court further agrees with Ferran that Alcoa's Port Captain, R. W. Davis, admitted that he probably saw the red-letter clause but did not pay much attention to it until the time of the incident in question.

The Court recognizes, Alcoa Exhibit #10, that a contract was entered into on October 8, 1956, in New York, to repair damage to the burned out S/S ALCOA CORSAIR. This contract obligated Ferran to carry comprehensive public liability insurance with limits of $500,000/$1,000,000 for bodily injury and $50,000/$100,000 for property damage. The red-letter clause was not included into this specific contract, not even by reference.

Alcoa exhibit #10 marks the first time, as far as the record reflects, that Alcoa sought, in writing, to get out from under the limitation expressed by the red-letter clause.

Article 13, mandatory insurance coverage, and Article 14, the hold harmless clause, appeared to the court as an obvious effort to circumvent the limitation of liability which controlled prior relationships between Alcoa and its repairman, Ferran.

■ The Court finds, as a matter of fact, that the red-letter clause was common in the trade and had been used by Ferran on many prior occasions in billing Alcoa for repair work and had been used on other Alcoa repair jobs subsequent to the accident. Under all these facts this Court is compelled to find that the limitation of the red-letter clause was in effect when the repair work on the job at issue was done.

Turning now to the main body of facts, the CORSAIR sailed from Mobile, Alabama, and arrived in New Orleans in the early morning of October 4, 1956. At some time before the CORSAIR docked at the Bienville Street Wharf, O. W. Davis, Alcoa's local port captain, notified Ferran of certain general repairs which the ship needed. One of the repairs requested was the re-bricking of the floor of the fire box of the starboard boiler. The CORSAIR arrived in New Orleans at about 6:30 A.M. on Thursday, October 4, 1956, with both its port and starboard boilers in use and working well.

After arrival, the fires of the starboard boiler were turned off to permit the fire box to cool for the brickwork. The port boiler thereafter supplied the ship's power. Ferran's superintendent in charge, Louis Tavan, inspected the items to be repaired and wrote the preliminary specifications, which were actually an itemization and/or extension of Captain Davis' orders.

No work was done on the starboard boiler that day. Ferran, however, was

engaged in making other repairs aboard ship and in assisting the U. S. Coast Guard and the American Bureau of Shipping on their inspection of the COR-SAIR. At the conclusion of their inspection the following day, both agencies found the ship's gear, equipment, and fittings, including its fire-fighting system, in good order.

Shortly after 8:00 A.M. on the morning of Friday, October 5, 1956, Ferran's labor gang boarded the CORSAIR to begin the brickwork in the fire box of the starboard boiler, after the Ferran employees had opened the boiler. Although the work was under the general supervision of Mr. Tavan, Hubert W. Hambrice, one of Ferran's labor foremen, was in immediate charge of the operation from 8:00 A.M. to 5:00 P.M. On this job, Hambrice used three bricklayers and several laborers.

The job Ferran had to do consisted of these steps: opening up the boiler, removing the old bricks and debris from the fire box, passing this material up and off the ship, lowering the new brick and tile from the dock down into the fire room and into the boiler's fire box, laying the bricks and tiling the arches, and then finally closing up and checking the boiler. As Alcoa had simply instructed Ferran to rebrick the starboard boiler, Ferran was free to perform the job in any reasonable way it saw fit.

Ferran went about the job in the following fashion: it first opened the access door, then to facilitate the removal of the old brick and debris, to provide ventilation in the fire box, and to make it possible to tile the arches of the fire box, Ferran removed two of the registers.

Alcoa contends that the two lower registers, numbered two and three, were removed. Ferran contends that the #1 dropline was connected at the top, disconnected at the bottom, and turned to one side. The tops of the #2, #3, and #4 droplines were connected and the bottoms disconnected and that the only opening in the boiler was the access door.

The Court finds as a matter of fact that the register in question, #3, had been removed. This controversy will be further discussed in subsequent paragraphs.

To remove the registers it was necessary to remove the droplines at these registers by disconnecting their upper and lower fittings. The droplines at the #2 and #3 registers were removed and placed on the burner bench.

The bricklayers entered the fire box and began removing the old brick and debris. This was passed out to the laborers, who hoisted it from the hold deck to the second deck, where it was moved through the door on the starboard side of the machinery spaces. From there it was passed through a fuel-oil loading compartment and then through a wing port on the starboard skin of the vessel and onto the dock.

The new brick and tile were brought to the bricklayers in the fire box along the same route. The bricklayers had about 1,000 bricks to lay and the four arches to tile. Consequently, the work was not finished at 5:00 P.M.

During the regular work day from 8:00 A.M. to 5:00 P.M. a fireman from the crew of the CORSAIR was on duty in the fire room maintaining steam on the port boiler and checking the operation of other machinery then in operation. The ship's engineering officers, not on leave, were working about the vessel under the supervision of the chief engineer, Mr. Lemon.

At 5:00 P.M. there was a change in both the engineering personnel of Alcoa and in some of the boiler workers of Ferran. The ship's engineering officers were off duty, but the Chief Engineer left Second Engineer Floyd L. Johnson aboard, since there was still work being performed on the engine room pumps and on the starboard boiler.

Plumber-Machinist Lee A. Smith was standing the watch as fireman-watertender until midnight. Night Relief Engineer Kent assumed the watch in the machinery spaces until midnight. Johnson, Smith and Kent were the only Alcoa

personnel in the machinery spaces from 5:00 P.M. to midnight.

No Alcoa employee had anything whatsoever to do with any of the brickwork, or with disassembling the droplines and removing the registers, or with replacing the registers and reassembling the droplines. Ferran employees, and only they, performed those steps as necessary steps in performance of their rebricking work.

As for personnel in Ferran's gang working on the boiler, Foreman Hambrice was relieved at 5:00 P.M. by Labor Foreman Marchetta, who assumed responsibility for the completion of the work. The labor force was relieved by a new gang, but the bricklayers stayed on overtime. In addition to this work party, Ferran had General Superintendent Tavan and an undetermined number of machinists and skilled laborers working on the engine room pumps.

At about 9:30 P.M. the brickwork on the starboard boiler was finished and the bricklayers left. The Ferran workers replaced the registers and began to attach the droplines. At the point where the #3 dropline was to be reconnected at its upper end, there was a male fitting (introduced into evidence as Alcoa-8), whose threads were worn, and/or may have been stripped or in a cross-threaded state.

This fitting, the source of much mischief, at this time, on the basis of its worn condition alone, was not proper for further safe use.

Nevertheless, one or more of the Ferran employees re-engaged the female fitting of the #3 dropline with this improper male fitting.

The identity of the Ferran employee or employees who made this reconnection is not absolutely clear, as there may have been someone other than Marchetta who had put the fittings together hand tight before Marchetta used a wrench to tighten the coupling.

The Court finds as a matter of fact that what is absolutely clear is that Ferran employees did reconnect the upper coupling of the #3 dropline with a worn and consequently improper fitting. The Court also finds, as a matter of fact, that the fitting in question was made of bronze and painted silver in lieu of steel which made a stronger connection.

Ferran's General Superintendent Tavan stated that the job of closing up a boiler, i. e., replacing and re-engaging registers, droplines and fittings and checking, is the work of a qualified boiler maker of machines. Marchetta, who did close up the boiler, was not qualified in either capacity.

Mr. Tavan stated that it was the duty of Ferran to check any dropline fittings it had disconnected before re-engaging them. If defects were found, they were to be reported to the ship's personnel, or were to be replaced properly with non-defective fittings.

As to checking the fitting by touch, Marchetta, who tightened the fitting, stated that all he did was turn the female fitting on the male with two half-turns of a wrench.

A summary inspection of the brickwork was made by Alcoa's Second Engineer Johnson after Marchetta and Tavan advised that the job was finished. Before leaving the engine room, Johnson wrote on the blackboard instructions for the firemen coming on at midnight and at 4:00 A.M. the next morning.

These orders called for lighting off the burners in the starboard boiler in rotation in order to facilitate the drying of the brickwork. The Ferran laborers finished cleaning up the area and removing their tools, then they left the ship.

Thereafter no one touched the starboard boiler until 2:00 A.M. the following day.

From midnight on, Relief Engineer Moses, an elderly but qualified chief engineer assigned to the CORSAIR by the Engineers Union, was standing the engineer's watch. Francis F. Gomez relieved Lee A. Smith as fireman-watertender.

At 2:00 A.M. on October 6, Gomez, pursuant to Johnson's instructions, be-

gan lighting off the burners of the starboard boiler to dry the brickwork. This was the first time that the starboard boiler had been touched by anyone since Ferran's Marchetta closed it up. Gomez was supposed to burn one fire for 10 to 15 minutes, turn it off, and, after a lapse of 10 or 15 minutes, fire another burner for a 10 to 15 minute period, continuing the process until he went off duty at 4:00 A.M.

Gomez, however, lit off only two burners between 2:00 A.M. and 4:00 A.M. and left each burning for a 10 to 15 minute period. One of the two burners he said he used was the burner on the #3 register. He experienced no difficulty.

Shortly before 4:00 A.M. on October 6, Thomas C. Deale, relieved Gomez as fireman. When the watch was exchanged, Deale found all burners on the starboard boiler off, and Gomez made only routine reports to him. At about 4:20 A.M. Deale made preparations to continue the rotation of burners in the registers of the starboard boiler.

He inserted a burner in the burner barrel of the #3 register and prepared to light that one off. By circulating the oil under pressure, Deale raised its temperature to about 230 degrees F., the proper level for lighting off.

At this point the evidence conflicts as to whether or not Deale turned on the forced draft blower to the starboard boiler to blow out any fumes which might be lingering in the fire box. In any event, Deale turned off the fuel oil circulating line and lit his torch.

He then opened the upper dropline valve at the #3 register; with his left hand he inserted the torch through the register's peephole, and with his right hand he began opening the lower valve on the register's dropline.

The critical moment has now arrived and Deale testifies as follows:

"* * * and after circulating my oil for 10 or 15 minutes to get it up to the pressure which I would say we burn it at, then I put my fan on and brought my air up to better than three inches or three inches and circulated the boiler good to make sure that it is no fumes in the boiler. Then I slowed my fan back down, because with a high fan you can't light that boiler with a torch. It would blow it out every time you put it in there. So I slowed it back down, and * * * which I am left handed * * * I opened the top valve to the * * * coming off of your burner * * * and I reached over and shut may circulating line off, and then when I reached to open the valve to the burner, which I would say I opened it a turn and a half, well, that is when the hot oil hit me on my face and arms, which I jumped * * * and bringing the torch with me * * * that is when the boiler ignited and it just was a mass of flames, that was all." Deposition, page 19.

"I closed it. Then I had my peephole open, which I stuck my torch into the boiler, and with my right hand I opened the valve about one turn and a half, and that is when the oil hit me from up above, side of my face (indicating.)" Deposition, page 38.

"* * * you close it, then you just stick your torch right into the boiler and open it, and that is when the oil hit me, like I said, on the side down on this arm." Deposition, page 42.

The clarity of this testimony is indicative that the procedure followed by this witness in firing the #3 register of the starboard boiler has been clear, concise, unequivocal and impressive to the Court.

When Deale inserted his torch into the peephole nothing at that moment happened as it would have had there been an accumulation of inflammable vapor behind the register.

As he opened the valve and pressure developed on the line the male and female units, Alcoa 7 and 8, parted company spraying oil at random.

Deale was sprayed and partially covered with intensely hot, 230 degrees F., fuel oil which struck him on the left side of his head and on the back of his left upper arm. Scalded with boiling oil, Deale instinctively jumped back, in his reflexive recoil pulling the torch from the peephole of the boiler.

The torch instantaneously ignited the spray of oil, and an intense blaze was set off in the fire room. The very heart of the flames separated Deale from a quick shut-off valve on the fuel oil header located forward of the #1 register which he tried to reach.

In order to get to the quick shut-off valve Deale would have had to return through the fire area. It appears that the quick shut-off valve was located at the forward end of the boiler, in a *cul-de-sac*. Unwilling to risk entrapment in an attempt to close the quick shut-off valve, Deale ran to the after end of the engine room with the intent of entering the $CO_2$ room and going through it to reach the remote controls for the fuel oil system.

Unfortunately the $CO_2$ room was locked and Deale was thus prevented from reaching the $CO_2$ room. By deposition at page 61 he states:

"Q. Suppose you could have gotten through the $CO_2$ room. Would that have helped matters any, in your estimation?

"A. You could have stopped the fire.

"Q. How?

"A. By shutting off the settling valve.

"Q. And what would the effect have been?

"A. It would have stopped the flow of oil.

"Q. And, of course, you would have done that had you gotten into that room?

"A. That was in my mind to do."

The now raging fire filled the engine spaces with that mass of flame and black smoke that only an oil fire can produce.

The heat was intense. Night Relief Engineer Moses, overcome by the smoke and heat, died of asphyxiation, his body later being found on the generator flat one level above the fire room.

Shortly after the blaze began a fire bell was sounded by someone unknown. The alarm wakened the skeleton crew of 20 aboard the vessel and they awoke to find their living quarters already engulfed in dense black smoke.

At the second deck, the flames poured out of the side port and out of the engine-spaces door. Both doors were open. On each door there was a brass plate with the inscription reading: "KEEP THESE DOORS CLOSED AT ALL TIMES."

The ship's personnel, in their movements about the upper decks, were confronted with severe heat and were blocked by walls of dense smoke. Two men knew the cause of the fire; one was dead and the other badly burned and presumably in a state of shock.

The fire raged on.

The next person to gain knowledge of the fire was night relief mate, Mr. Graham. Mr. Graham testified quite candidly that he did not know the location of the control station, another apparatus for the fuel oil system. As expeditiously as possible, Graham went below in an attempt to shut down the fuel supply. The lighting below decks was insufficient and Mr. Graham found himself "very much lost".

The New Orleans Fire Department was summoned by a watchman at the gangway of the CORSAIR, and fire engines arrived at about the same time as Chief Engineer Lemon, that is, about 4:40 A.M.

It is not clear to the Court whether Chief Lemon first tried to reach the control station or the $CO_2$ room. It is borne out by the testimony, however, that he did make one unsuccessful attempt to reach the control station and one successful attempt. He successfully cut off the supply of boiler fuel feeding the fire at about 5:00 A.M.

His attempt to reach the control station had been abortive. He testified on two occasions, once before the Coast Guard and once on deposition, that he made an attempt to reach the controls system just aft of the engine room door, port side. Whether Mr. Lemon was confused by the urgency of the situation, or the holocaust that confronted him, is not clear, however it is clearly demonstrated that the control station was located on the starboard side of the vessel and not the port side.

Compounding the inaccessibility of the controls, the Court notes that Mr. Smith, the fireman on watch during the day, testified that the control station was on the port side of the vessel; Mr. Kent, the night relief engineer from 4:00 P.M. to midnight testified that he was not familiar with the location of the control station; Mr. Graham, the night relief mate on watch at the time of the fire, did not know the location of the station on the starboard side of the second deck, amidships, and more important, neither did Mr. Deale who was on watch at the boilers. Mr. Deale testified as follows:

"Q. And if the $CO_2$ room had not been locked, would you have been able to start that system?

"A. No, I wouldn't have tried to start that system while I was down there.

"Q. Why?

"A. You couldn't start it from there.

"Q. Where do you start it from?

"A. Well, I presume on there it was up on the top deck, on the passenger ship. I just don't know exactly where the main pulling valve was to them or not, to set them bottles off, but my idea was to go through the $CO_2$ room as an escape." (Deposition pages 53–54.)

The control station is to be distinguished from the $CO_2$ room in that the $CO_2$ room is located in the hold aft of the starboard machinery spaces. If the $CO_2$ room had not been locked and the ven-

tilating fans off, the fire could have been brought under early control and damage minimized. In this light Mr. Deale testified as follows:

"Q. Suppose you could have gotten through the $CO_2$ room. Would that have helped matters any, in your estimation?

"A. You could have stopped the fire.

"Q. How?

"A. By shutting off the settling valve.

"Q. And what would the effect have been?

"A. It would have stopped the flow of oil.

"Q. And, of course, you would have done that had you gotten into that room?

"A. That was in my mind to." (Deposition, page 61.)

To make the CORSAIR case even more difficult to accept, it appears from Captain Davis' testimony that had the $CO_2$ been activated, it would not have been effective in extinguishing the fire. The engine room of the CORSAIR was equipped with a ventilating system consisting of certain fans which would move approximately 56,000 cubic feet of air per minute in and out of the engine room. There was no remote control for this ventilating system and the ventilating fans were accordingly on after the fire was extinguished.

Therefore, even if the $CO_2$ system had been activated, the $CO_2$ would have been withdrawn from the engine room as fast as it was put in. Hence we have a system designed to fight fire consisting of carbon dioxide which would have been totally ineffective because the fire fighting chemical would have been pulled out of the area of the fire by ventilating fans as fast as it was discharged from the fire fighting system.

So even if the $CO_2$ system had been activated the lack of automatic stops for the ventilating system would have prevented the carbon dioxide from serv-

ing its purpose. It would thus appear that the CORSAIR, in this respect, was unseaworthy by naval architectural design and standards.

After Chief Engineer Lemon reached the remote fuel oil controls the fire was quickly extinguished, its source cut off. It was not until 6:30 A.M. that the machinery spaces had cooled sufficiently to allow entry.

At that time Chief Engineer Lemon and Port Captain Davis went below to search for the missing Night Relief Engineer, Mr. Moses. As stated before, his corpse lay on the generator flat.

While below, both Davis and Lemon found the dropline at the #3 register separated at its upper coupling.

The next group to enter the engine room consisted of Benjamin J. Morrison, then employed by Ferran, Louis Tavan, Ferran's superintendent, and Captain Davis. They went down about 9:00 A.M., Saturday, to examine the damage in connection with the repairs to be made. Morrison held a license as a marine engineer and had worked for many years in the oil field and ship repair business. He was naturally curious about possible causes of the fire.

In his examination, Mr. Morrison testifies that he found that the valve of the forced draft blower was in the closed position. Not only did he check the position of the valve wheel, but he asserts that he checked the thread stem at the forced draft blower itself and found that it also was closed.

Although he was not with the Morrison inspection group, Chief Leman found the valve of the forced draft blower open and in operating position on his inspection after the fire.

Whether or not Deale turned on the forced draft blower prior to insertion of the lighter to ignite the third register is a subject of conflicting testimony. Nevertheless, the Court finds that Deale did turn on the blower before seeking to ignite the register. Disregarding the human testimony, the inescapable physical facts indicate that *no* explosion

occurred when the torch was first inserted into the peephole. Had there been residual oil and vapor behind the register an explosion would probably have occurred within the register and boiler if the blower had not been in operation.

The clearest and most reasonable construction of the testimony is that the critical valve was parted simultaneously or just prior to the fire. This could only have occurred as a result of a defective connection or as a result of an explosion due to combustion of residual oil and fumes which Deale had failed to solve by proper use of the blowers.

The Court has discarded the premise that combustion within the register caused fire because it is felt that an entirely different type of damage would have resulted, that is, the register would have been blown off, there would have been inside damage to the register and boiler, whereas it is an accepted fact that there was no damage except the dislocation of the critical valve.

The face of the register was scorched and the intense heat left its mark, but there was no serious mechanical damage, all leading to the inescapable conclusion that this fire had its inception when the male and female components of the valve parted, spraying boiling oil over the area and onto the face and neck of the man who stood at the register.

Thus it is that we may discard the testimony of the several witnesses and decide this matter on the physical facts as heretofore decided, that the blowers were turned on before ignition took place.

With evidence so hopelessly in conflict, the Court notes that the photographic evidence of the scene of the calamity taken shortly after the fire shows the plate housing the #3 register intact, but the dropline parted at the upper coupling. Strange how a flareback would not damage the outside casing or register housing but still part the upper coupling.

On October 8, 1956, Alcoa and Ferran entered into a general written contract (the only written contract ever made between the parties) to repair the fire dam-

age on the CORSAIR. Payment was again to be on a time-and-materials basis. This written contract specifically called for Ferran to carry insurance in the amount of one million dollars for the fire-damage repairs, as previously discussed.

Alcoa re-engaged the services of Ferran at this point because Ferran was most familiar with the CORSAIR and it was expedient that the CORSAIR be returned to service as soon as possible.

■ First of all, there can no longer be any doubt that a contract to repair a vessel is a maritime contract. Such has long been the law, The General Smith, 4 Wheat. 438, 17 U.S. 438, 4 L.Ed. 609; North Pacific Steamship Company v. Hall Brothers Company, 249 U.S. 119, 31 S.Ct. 221, 63 L.Ed. 510, and accordingly federal maritime law governs the construction of the agreement, even if consensual, Booth Steamship Company v. Meier & Oelhaf Company, 262 F.2d 310 (2 Cir. 1958).

■ It is also old hat that when a shipowner and an expert independent contractor enter into a service agreement, the shipowner is entitled to indemnification for all damages sustained as a result of the contractor's breach of its warranty of workmanlike service, all as brought out in the Longshoreman versus Shipowner versus Stevedore cases, Ryan Stevedoring Company v. Pan-Atlantic Steamship Corporation, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133; Weyerhaeuser Steamship Company v. Nacirema Operating Company, Inc., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491; Crumady v. Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413.

■ It is not a gigantic step forward to hold the "warranty of workmanlike service that is comparable to the manufacturer's warranty of the soundness of its manufactured product", Ryan, supra, 350 U.S. at pages 133–134, 76 S.Ct. at page 237, to a ship repairman. Such a step has been made on several occasions. Booth Steamship Company v. Meier & Oelhaf Company, 262 F.2d 310 (2 Cir.

1958); Hershey Chocolate Corporation v. The S.S. Robert Luckenbach, 184 F. Supp. 134 (D.Ore. 1960), affirmed 295 F. 2d 619 (9 Cir. 1961).

In the latter case, Judge Kilkenny, considering the liability of a ship repairer, Albina Engine & Machine Works, stated:

"Albina argues that these cases should be distinguished in that they involve personal injuries to a stevedore, rather than property damage to a vessel. I am unable to distinguish the logic or the soundness of the reasoning in the stevedoring cases from what should be the logic and the soundness of the reasoning in arriving at a proper conclusion in this case. The decisions in the stevedore cases control. I see no distinction between liability by way of indemnity and liability by way of direct damage or compensation." Hershey, supra, 184 F.Supp. at pp. 140–141.

Thus the court is presented with a register, #3 starboard, which was not prone to spraying boiling oil about the engine room prior to October 6, 1956, such register being removed by an expert ship repair contractor in re-bricking the starboard boiler on October 4th and 5th, being re-assembled and after being used once, spraying boiling oil about the engine room and onto the ship's personnel from the upper dropline coupling.

■ The Court finds that Ferran's negligent. assembling of the upper coupling of the dropline on the #3 register was, in fact, a breach of its warranty of workmanlike service and liability is thus imposed under the authorities cited heretofore.

If the register had not been removed, as asserted by Ferran, there is positive evidence to the effect that Marchetta sought to tighten the defective coupling in question with a hand wrench. The Court concludes that Ferran is liable for its negligence in violating the warranty of workmanlike service as the proximate cause of this accident.

Thus far, this Court has cast Ferran both factually and legally in liability to Alcoa for the damage resulting from its breach of warranty. Now the scorching, searing question is whether an award should or should not be reduced due to unseaworthiness of the vessel, if any, and acts of negligence, if any, which existed before or transpired after the inception of the fire.

First of all, the Court notes that the fire could have been extinguished in a matter of seconds had the quick shut-off valve been located in a more accessible area. The two boilers of the CORSAIR were located at the forward end of the engine room space, and almost immediately forward of the boiler was a thwartship bulkhead which had no openings in it. Crew members working at the boilers and suddenly confronted with an emergency situation had to make their exits from the after end of the engine room. Thus, in the event of a fuel oil fire in the machinery spaces, the one piece of safety equipment to cut the source of oil feeding the fire is inaccessible.

This piece of safety equipment was inaccessible by the vessel's very design. The Court finds a patent case of unseaworthiness when a piece of safety equipment is rendered inaccessible by the very catastrophe which it was designed to prevent.

Secondly, a locked $CO_2$ room is as good as no $CO_2$ room at all. This elementary point is too obvious to cry out for an elaborate dissertation on the functions of $CO_2$ and the purposes of the room which stores it.

Inasmuch as the $CO_2$ was not activated, the Court will not again stress the fact that a ventilating system capable of removing 56,000 cubic feet of air per minute would have removed the $CO_2$ as fast as it was put into the engine room.

Third, the court should point out that, compounding the negligence of locking the $CO_2$ room, Deale could have stopped the fire by shutting the "settling valve", the effect of which would have been to stop the flow of oil, for, in his own words, "that was in my mind to do".

Fourth, the Court finds that those members of the crew on watch at the time, officer and rank-and-file, did not know the location of the control station for the machinery spaces which were located on the starboard side, second deck, amidships.

Fifth, doors leading to the engine room were left wide open, even though they were supposed to be "closed at all times". Black, dense smoke from the fire spewed into the crew's quarters further compounding the pandemonium that ensued after the fire bell was sounded and making things quite difficult for officers and men who did not know the location of the control station for the machinery spaces. Indubitably, a raging fire that might have been stopped at a relatively early stage escalated and raged on, fed by oil until Chief Engineer Lemon finally turned the valves off from the remote control station some 40 minutes later.

This Court finds that these acts of negligence and unseaworthiness warrant the application of the doctrine of "Avoidable Consequences".

In legal support of the doctrine, see Southport Transit Co. v. Avondale Marine Ways, 234 F.2d 947, 951–954 (5 Cir. 1956) and extensive authorities cited therein. According to that theory, "a plaintiff, with an otherwise valid right of action, is denied recovery for so much of the losses as are shown to have resulted from failure on his part to use reasonable efforts to avoid or prevent them." 234 F.2d at 951–952. Therefore, the question arises whether, and to what extent, if any, the losses sustained could have been averted or diminished by the performance of any reasonable efforts or responsibilities imputable to Alcoa. In other words, after the initial damages had resulted from the acts of respondent Ferran, were any of the subsequent damages attributable to libelant Alcoa's own negligence or the unseaworthiness of the vessel. The Court feels so, for much of the damage resulted from

Alcoa's failure to have reasonable fire fighting apparatus available and usable, as well as its failure to perform certain duties which would have curtailed the heavy losses that occurred.

In conclusion the Court holds:

1) That the Red-Letter clause is applicable to and binding upon libelant Alcoa and respondent Ferran;

2) Ferran's negligence was the proximate cause of the start of the fire;

3) The negligent acts of Alcoa and unseaworthy condition of the CORSAIR as specified in this opinion must be construed to mitigate the damages which occurred.

As stipulated by counsel, this Court is not called upon to determine the quantum nor to apportion the damages which ensued as a result of the initial fire and those damages which resulted from the escalation of the fire and smoke that could at some point have been avoided had the vessel been seaworthy and Alcoa free of negligence.