**ALCOA STEAMSHIP COMPANY, Inc.,**
**Plaintiff-Appellee Cross Appellant,**

v.

**CHARLES FERRAN & CO., Inc. and**
**Glens Falls Insurance Company, et al.,**
**Defendants-Appellants Cross Appellees.**

**No. 28944.**

United States Court of Appeals,
Fifth Circuit.

April 26, 1971.

Rehearing Denied and Rehearing En
Banc Denied June 23, 1971.

George B. Matthews, Lemle, Kelleher, Kohlmeyer, Matthews & Schumacher, New Orleans, La., for Charles Ferran & Co., Inc., and Glens Falls Insurance Co.

Leon Sarpy, James G. Burke, Paul A. Nalty, New Orleans, La., Proctors for Excess Underwriters of Charles Ferran & Co., Inc.; Chaffe, McCall, Phillips, Burke, Toler & Sarpy, New Orleans, La., of counsel.

Benjamin W. Yancey, Edward S. Bagley, Francis Emmett, New Orleans, La., for Alcoa Steamship Co., Inc.; Terriberry, Carroll, Yancey & Farrell, New Orleans, La., of counsel.

Before JOHN R. BROWN, Chief Judge, and GEWIN and THORNBERRY, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Now on its second voyage here [1] the case presents a rehash of the Louisiana Direct Action and Red Letter Clause problem, one concerning interest on the limited liability figure, an intramural controversy between the Shiprepairer's [2] primary and excess underwriters as to interest, and a tag end complaint by Shipowner [3] with respect to the amount of interest which has accumulated in one year between the date of the casualty and the first judicial demand. We affirm in part and reverse in part.

After remand following Op [iii] the parties never got around to proving Shipowner's total damages or the reduction thereof under the doctrine of avoidable consequences. About the time it seemed likely that the Special Master and District Court would adhere to our holding in Op [iii] p. 56, that the Red Letter Clause [4] limitation of $300,000

---

1. The prior opinions here and in the District Court appear in this sequence: [i] Alcoa Steamship Company, Inc. v. Charles Ferran & Company, Inc., E.D.La., 1965, 242 F.Supp. 962; [ii] Alcoa Steamship Company, Inc. v. Charles Ferran & Company, Inc., E.D.La., 1966, 251 F.Supp. 823, 1966 A.M.C. 1029, aff'd in [iii] Alcoa Steamship Company, Inc. v. Charles Ferran & Company, Inc., 5 Cir., 1967, 383 F.2d 46, 1967 A.M.C. 2578, cert. denied, 393 U.S. 836, 89 S.Ct. 111, 21 L.Ed.2d 107. For convenience these prior opinions will be referred to as Op [i] [ii] [iii], with page citations following, e. g., Op [i] p. 962.

2. Charles Ferran Company, Inc.

3. Alcoa Steamship Company, Inc.

4. The pertinent part of this clause is:
"* * * we undertake to perform work on vessels * * * only upon condition that we shall not be liable in respect to any one vessel, directly or indirectly in contract [or in] tort * * * to its owners, charterers or underwriters for any injury to such vessel, its cargo, equipment or movable stores, or for any consequences thereof, unless such injury is caused by our negligence or the negligence of our employees and in no event shall our aggregate liability to all such parties in interest for damage sustained by them, as a result of such injury, exceed the sum of $300,000.00.
"In connection with the accident and/or indemnity and/or insurance clauses, if any, contained in your specifications, relating to liability for personal injuries, please note that we do not agree to same, in so far as they undertake to impose any liability or any obligation to take out or maintain insurance beyond the liabilities or the obligations to insure imposed upon us by law."

extended to the underwriters under the Louisiana Direct Action Statute,[5] the Primary Underwriter (Glens Falls) threw in the towel by paying the full $300,000 into the Registry. The Master entered (and the District Court approved) an order limiting liability of Shiprepairer and its Underwriters to $300,000, but he allowed interest against Shiprepairer and its Primary Underwriter on that sum, from the date of judicial demand (October 1957), rather than the date of the loss (October 1956). Shipowner by its appeal wants to recover the full loss from the Underwriters under the Direct Action Statute, plus interest for the additional year. The Primary Underwriter continues to join hands with its long time but now-sometime-ally, the Excess Underwriters (Lloyds), as both resist that awful prospect, but soon fall out as each takes the generous view that the other, not it, American Fidelity & Casualty Company, Inc. v. St. Paul-Mercury Indemnity Company, 5 Cir., 1957, 248 F.2d 509, should bear the loss of interest.

### Red Letter and Direct Action

In Op [iii] we affirmed the earlier decisions of the District Court upholding the validity of the Red Letter Clause (see note 4, *supra*) and extending that dollar limitation to the Underwriters under the Direct Action Statute. Ordinarily that would be an end to it under the law of the case doctrine. Lincoln National Life Insurance Company v. Roosth, 5 Cir., 1962, 306 F.2d 110 (en banc), cert. denied, 1963, 372 U.S. 912, 83 S.Ct. 726, 9 L.Ed.2d 720. But we agree that the matter deserves another look-see in view of the long awaited answer to the Jane Smith 4–1–4 riddle [6]

5. "No policy or contract of liability insurance shall be issued or delivered in this state, unless it contains provisions to the effect that the insolvency or bankruptcy of the insured shall not release the insurer from the payment of damages for injuries sustained or loss occasioned during the existence of the policy, and any judgment which may rendered against the insured for which the insurer is liable which shall have become executory, shall be deemed prima facie evidence of the insolvency of the insured, and an action may thereafter be maintained within the terms and limits of the policy by the injured person, or his or her survivors mentioned in the Revised Civil Code Article 2315, or heirs against the insurer. The injured person or his or her survivors or heirs hereinabove referred to, at their option, shall have a right of direct action against the insurer within the terms and limits of the policy; and such action may be brought against the insurer alone, or against both the insured and insurer jointly and in solido, in the parish in which the accident or injury occurred or in the parish in which an action could be brought against either the insured or the insurer under the general rules of venue prescribed by Art. 42, Code of Civil Procedure. This right of direct action shall exist whether the policy of insurance sued upon was written or delivered in the State of Louisiana or not and whether or not such policy contains a provision forbidding such direct action, provided the accident or injury occurred within the State of Louisiana. Nothing contained in this Section shall be construed to affect the provisions of the policy or contract if the same are not in violation of the laws of this State. It is the intent of this Section that any action brought hereunder shall be subject to all of the lawful conditions of the policy or contract and the defenses which could be urged by the insurer to a direct action brought by the insured, provided the terms and conditions of such policy or contract are not in violation of the laws of this State.

It is also the intent of this Section that all liability policies within their terms and limits are executed for the benefit of all injured persons, his or her survivors or heirs, to whom the insured is liable; and that it is the purpose of all liability policies to give protection and coverage to all insureds, whether they are named insured or additional insureds under the omnibus clause, for any legal liability said insured may have as or for a tort-feasor within the terms and limits of said policy."
LRS-R.S. 22:655 (Supp. 1962).

6. Maryland Casualty Co. v. Cushing, 1954, 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806, 1954 A.M.C. 837.

which came 15 years later in our celebrated *Nebel Towing*.[7]

Whatever else might be said by the protagonists about *Nebel Towing*, or what else it may portend, neither our holding therein that the statutory limitation of shipowner's liability is a defense personal to the assured shipowner nor the elucidation of it, transfers to a contractual limitation contained in the agreement which is the principal (if not whole) source of rights and obligations.

The problem of course is an amphibious one which is the result of mixing the Louisiana codal provision concerning *debtors in solido* [8]—as the Direct Action Statute (note 5, *supra*) expressly characterizes the liability—into a maritime case. In the context of a Direct Action situation the cases, as did *Nebel Towing*, turn on whether the particular defense is "personal to some of the other codebtors." [9] And until rejected in *Nebel Towing*, none involved directly the affirmative provision of Art. 2098 (note 8, *supra*) extending to all codebtors the defenses "resulting from the nature of the obligation."

■ Although we have found little in the way of Court decisions or the preferred legal literature of the Civil Law [10] to guide us through the sometime quaint codal language, we are of the clear view that the Red Letter Clause defense is not [i] personal to the

7. Olympic Towing Corp. v. Nebel Towing Co., Inc., 5 Cir., 1969, 419 F.2d 230, 1969 A.M.C. 1571, reh. en banc denied, 419 F.2d 238, cert. denied, Nebel Towing Co., Inc. v. Olympic Towing Corp., 1970, 397 U.S. 989, 90 S.Ct. 1120, 25 L.Ed.2d 396. See Bue, Cushing Revealed—The Grisly Spectre is Precariously Defined As To Size And Shape,—July 1970 Insurance Counsel Journal 401.

8. "Art. 2098. Defenses available to debtors in solido
   Art. 2098. A codebtor *in solido*, being sued by the creditor, may plead all the exceptions resulting from the nature of the obligation, and all such as are personal to himself, as well as such are are common to all the codebtors.
   He can not plead such exceptions as are merely personal to some of the other codebtors."
   L.S.A.–C.C. Art. 2098 (1952).
   See the following articles for a full explanation of the meaning of *"debtor in solido"*: Comment, XXV Tulane Law Review 217; and Comment, XIV Louisiana Law Review 828.

9. Defenses which have heretofore been considered "personal" under Louisiana law, thereby precluding their assertion and utilization by a tortfeasor's insurer, include: infancy, LSA–R.S. 9:571, see Rouley v. State Farm Mutual Automobile Ins. Co., W.D.La., 1964, 235 F.Supp. 786; coverture, see Edwards v. Royal Indemnity Co., 1935, 182 La. 171, 161 So. 191 and Dumas v. United States Fidelity & Guaranty Co., 1961, 241 La. 1096, 134 So.2d 45; charitable immunity, see Lusk v. United States Fidelity & Guaranty Co.,

La.Ct.App., 1941, 199 So. 666; and governmental immunity, Brooks v. Bass, La.Ct.App., 1938, 184 So. 222. As succinctly stated in Simmons v. Clark, La. Ct.App., 1953, 64 So.2d 520; "[p]ersonal defenses are such as infancy, interdiction, coverture, lunacy, bankruptcy and the like." 64 So.2d at 523. In ITCO, E.D.La., 1965, 242 F.Supp. 950 was added those with a right to limit their liability. See also, *Nebel Towing, supra,* and Alcoa v. Ferran, *supra,* at n. 1.

10. Most of the literature regarding defenses "resulting from the nature of the obligation" in Article 2098 speak in terms of defenses which derive from the non-existence of the obligation or from various types of nullity. See 25 XXV, Tulane Law Review (1951), comment, Solidary Obligations 217, 224. We have examined the material cited in notes 69, 70 and 71, and find nothing significant as bearing on our problem. The literature recognizes that frequently the "nature of the obligation" defense and defenses "as are common to all the codebtors" coalesce. But the "common" defense element of Article 2098 is not helpful here since this necessarily begs the question whether the Red Letter Clause is a defense available to all—Shiprepairer and its Underwriters. Nor have we found any substantiation in the literature or in Court decisions for Shipowner's argument that by the interplay of codal Articles 1764, 1841, 1903 (see Appellant's brief pages 5–6 and note 1), the "nature of the obligation" is an implied term of a contract since an expressed provision (the Red Letter Clause) is an "accidental stipulation."

Shiprepairer[11] and is [ii] one resulting from the nature of the obligation.

Obviously the defense is not "personal" to Shiprepairer, so the pivotal question is: what is the nature of the transaction. The nature of the transaction was, of course, a ship repair contract which expressed rights and duties, but which—perhaps even more important—created the relationship out of which the law would impose implied duties, rights, and obligations. Typical would be the implied obligation (in the absence of contract terms) not to cause damage by negligence, and for amphibious work, the presence of the ubiquitous, awesome WWLP.[12] And if the "transaction" encompasses the litigation, it meets the test. For the action asserted both negligence and breach of WWLP.

Given the validity of the Red Letter Clause (Op [iii] pp. 55, 56), its effectiveness is proved by the result here—a ceiling of $300,000 on damages stated to have exceeded $1,000,000.[13] The clause was used for the express purpose of limiting the underlying obligation in the event of foreseeable occurrences, which would be in the nature of a tort or breach of the WWLP, in which damages could run into the millions.

The District Judge was correct in stating it this way: "Here the size of the obligation was part of the obligation." (Op [ii] p. 831).

The Red Letter Clause is valid and extends to insurers under the Direct Action Statute.

## Red Letters and Interest

The Master and District Court awarded interest to Shipowner on the $300,000. The question now is whether that is consistent with the term "aggregate liability" as used in the Red Letter Clause (see note 4, *supra*).

We readily answer in the affirmative. At the outset the clause describes liabilities in terms of those to whom it might become liable as the vessel's owners, charterers, or underwriters. It is next stated therein that the "aggregate liability to all such parties" shall be limited to $300,000. There are thus both claims—in the sense of distinctive types of losses, e. g., to hull, to stores, to cargo—and persons to whom it might be liable, which could readily make the ceiling ineffective unless it is certain that all are to be lumped together so the ceiling would apply to them all.

Equally important, this was, in effect, an implied undertaking by Shiprepairer that, if it was, or became, liable for any such damage, it would have to pay up to the limit of $300,000. As with any other obligation—and in the Admiralty most torts—when the one cast fails to pay, then interest on the amount due, but withheld, is allowed as a means of making the other party whole. There is justification for that here since it took from 1956 to 1969 to get even the limited recovery. And lastly, this being a contract claiming immunity it is to be strictly construed. Herd

11. Citing the District Court on this point the Court in Nebel Towing said:
"[T]he nature of a 'personal defense' under Louisiana law is explained in [the] excellent opinion in * * * [Op [ii] p. 831] * * * *. After pointing out a number of defenses which have been held to be 'personal' under Louisiana—* * * [the court] stated:
Amongst these apparently varied "personal" defenses, one common denominator is discernible—each person possessing a "personal" defense obtained that defense because the law granted it to all members of his class as a matter of public policy. The personal defense attaches to the status. Hence parents, children, husbands, wives, governmental units, charitable organizations, bankrupts, lunatics, interdicts, vessel owners, and the like possess a defense denied their respective insurers.'" See Op [ii] p. 831.

12. Warranty of Workmanlike Performance. See Delaneuville, Jr. v. Simonsen, Jr., 5 Cir., 1971, 437 F.2d 597, at p. 598, n. 1, and cases therein cited.

13. Notwithstanding the limitation of $300,000 imposed by the Red Letter Clause there is no substantial doubt that the actual damages inflicted on the ship amounted to $1,000,000. See Op [i] pp. 966, 973.

& Co. v. Krawill Machinery Corp., 1959, 359 U.S. 297, 304–305, 79 S.Ct. 766, 3 L.Ed.2d 820, 1959 A.M.C. 879.

Shiprepairer (and hence its Underwriters) are liable for interest on the $300,000.

*Allies Part—Whose Move—Who Pays?*

■ Comforted by the serene knowledge that the Red Letter ceiling has been maintained, Primary and Excess Underwriters now part company, with each turning on the other for the payment of interest. From a combination of factors we think Primary Underwriters have the better of it so we fix the liability on Excess Underwriters.

The case law in non-marine policies is generally consistent in disallowing interest in excess of the dollar policy limits unless the policy contains language which provides for interest.[14] We do not agree with the Master's reliance on Maryland Casualty Co. of Baltimore, Md. v. Omaha Electric Light & Power Company, 8 Cir. 1907, 157 F. 514 and Tulare County Power Company v. Pacific Surety Company, 1919, 43 Cal.App. 315, 185 P. 399 for the holding that Primary Underwriters have a liability in excess of the dollar limit.

But we do not make this as a choice of law for general (or Louisiana) application. We do it in the context of this situation in which the insurance was a carefully dovetailed, integrated program in which each had significant interests at stake, often regardless of the ultimate outcome of a potential claim. Primary Underwriter had the first $300,000 less a franchise (deductible) of $500.[15] The excess cover was expressly based upon the named primary policy and subject to all its terms and conditions. It picked up liabilities in excess of $300,500.[16]

Contrary to the argument Excess Underwriter makes, which was successfully pressed on the Master, this was in no sense a situation where Primary Underwriter had the "use of this money" for 13 years. Both Underwriters were actively interested in the handling of this casualty loss, as witnessed by the vigorous arguments advanced orally and in briefs, both here and below, by these close collaborators as proctors for the Shiprepairer, without the slightest suggestion that there were differences between them. More than that, as the 15 year struggle in *Jane Smith* demonstrates, no one could have predicted with any assurance, until we ruled and the last bell from Washington tolled out denial of certiorari, whether the Red Letter Clause would survive or what would happen under the Louisiana Direct Action Statute. The baseless nature of the

14. Primary Underwriter stresses these cases which so hold: Pacific Coast Casualty Company v. General Bonding & Casualty Insurance Company, 9 Cir., 1917, 240 F. 36; Maryland Casualty Company of Baltimore, Md. v. Omaha Electric Light & Power Company, 8 Cir., 1907, 157 F. 514; Tulare County Power Company v. Pacific Surety Company, 1919, 43 Cal. App. 315, 185 P. 399; Davison v. Maryland Casualty Company, 1908, 197 Mass. 167, 83 N.E. 407; National & Providence Worsted Mills v. Frankfort Marine Accident, etc., Company, 1907, 28 R.I. 126, 66 A. 58; Munro v. Maryland Casualty Company, 1905, 48 Misc. 183, 96 N.Y.S. 705; Brewster v. Empire State Surety Co. of New York, 1911, 145 App.Div. 678, 130 N.Y.S. 439; Saratoga Trap Rock Co. v. Standard Accident Insurance Co., 1911, 143 App.Div. 852, 128 N.Y.S. 822.

15. The policy provided:
"3. The maximum liability of [the Primary Underwriter] on account of any one disaster or casualty shall not exceed: $300,000 [under Section 1A], $300,000 [under Section 1B].
4. * * * [The] sum [of $500.] shall be deducted from the amount payable hereunder * * *."

16. The policy recited:
"Subject to all terms and conditions as per underlying policy with the Marine Office of America * * * and only to pay the excess of $300,500 each and every accident, or if the underlying Underwriters are obligated to pay a larger sum under the terms of their coverage, as to liabilities chargeable to single accident, then to pay the excess of such larger sums plus $500."

"money retained" theory is shown by contemplating what would have occurred had Primary Underwriter on its own and without consent of Excess Underwriters, paid into the registry its full $300,000 before liability had been adjudicated, or before the validity of the Red Letter Clause had been determined.

And to cap it all off, the insuring agreement (see note 16, *infra*) spells out how amounts in excess of policy limits are to be adjusted under the insurance program. It provides that "if the [Primary] Underwriters are obligated to pay a larger sum under the terms of their coverage, as to liabilities chargeable to a single accident, then [Excess Underwriters are] to pay the excess of such larger sums plus $500."

Obviously what was in mind was what has occurred here—a Court holding that despite the fixed ceiling of $300,000 the law requires payment of interest thereon. Indeed, affirming the Master's holding would automatically trigger this obligation, so the result is the same whether done on that basis or our approach which fixes it directly on Excess Underwriters.

Consequently the decree is reversed to put liability for interest on Excess Underwriters.[17]

### When Does Interest Commence?

Shipowner's attack on the lower Court's holding that interest would commence from the date of judicial demand (October 1957) rather than from the date of casualty (October 1956) may be disposed of quickly.

■ Although allowance of interest is *ordinarily within* the discretion of the Trial Court, it is equally true that for property damage "interest from the date of loss has long been allowed, of course,

in admiralty for property loss". National Airlines, Inc. v. Stiles, 5 Cir., 1959, 268 F.2d 400. This is the general rule prevailing in admiralty. See, Petition of City of New York, 2 Cir., 1964, 332 F.2d 1006. The Court therein stated:

"It has long been held proper for admiralty courts fully to restore the injured party to his condition at the time of injury by allowing and fixing prejudgment interest from the date of the loss in proceedings involving property damage. * * * "

■ Here neither the Master nor District Judge gave any reason why this rule should not be followed. We might, of course, send this back for reconsideration, but since cases should at least fade away, if not die,[18] from our view we think the equities predominate in Shipowner's favor, especially as a permissible, slight amelioration of the Red Letter immunity, Herd & Co. v. Krawill Machinery Corp., *supra*, and we should so state without more delay. Oil Screw Noah's Ark v. Bentley & Felton Corporation, 5 Cir., 1963, 322 F.2d 3, at 10, 1964 A.M.C. 59, at 68.

In summary we give full application to *Nebel Towing* which remains undiminished in its binding force but hold that the defense of the Red Letter Clause is not personal to the Shiprepairer as it is one resulting from the nature of the obligation and consequently is available to the Underwriters. And specifically we affirm (i) extending the Red Letter Clause to the Underwriters and (ii) the allowance of interest, but we reverse by holding (iii) that Excess, not Primary, Underwriters are to pay interest and (iv) interest is to commence on the date of the loss. We remand for computation.

Affirmed in part, reversed in part and remanded.

---

17. There is no merit to Excess Underwriter's contention that Shipowner, in the formal "Certificate of Satisfaction" of judgment, released or waived its claim to the interest.

18. Bros., Incorporated v. W. E. Grace Manufacturing Company, 5 Cir., 1963, 320 F.2d 594.

ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing on behalf of Alcoa Steamship Co., Inc. is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied. The Motion to Modify the Mandate on behalf of Alcoa Steamship Co., Inc. to increase the allowable interest from 5% to 7% is denied.

It is further ordered that the Petition for Rehearing on behalf of Charles Ferran & Co. and its Excess Underwriters be, and hereby is, denied.