Bradford COLEMAN, Appellant,

v.

JAHNCKE SERVICE, INC., Appellee.

The HOME INSURANCE COMPANY
et al., Appellants,

v.

The GREATER NEW ORLEANS EX-
PRESSWAY COMMISSION and Winn-
Dixie Louisiana, Inc., Appellees.

No. 21106.

United States Court of Appeals
Fifth Circuit.

Feb. 16, 1965.

Roger H. Fellom, William S. Stone, Deutsch, Kerrigan & Stiles, New Orleans, La., for appellants.

Cornelius G. Van Dalen, Jack G. Carinhas, Jr., New Orleans, La., for appellee Jahncke Service, Inc.

Donald L. King, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for appellee, Winn-Dixie Louisiana, Inc., Robert B. Acomb, Jr., New Orleans, La., of counsel.

N. Buckner Barkley, Jr., Charles E. Lugenbuhl, William McM. King, Lancaster, King & LeCorgne, Lemle & Kelleher, New Orleans, La., for The Greater New Orleans Expressway Commission.

Before RIVES and WISDOM, Circuit Judges, and MORGAN, District Judge.

WISDOM, Circuit Judge.

These appeals present three questions: (1) may petitioner Jahncke limit liability under 46 U.S.C. § 183; (2) is a direct action available against Jahncke's insurer, Home Insurance; (3) is the claim of appellant Coleman barred by laches. Lurking in the fog is Maryland Casualty Co. v. Cushing,[1] a grisly spectre of undefined size and shape. Putting our trust in the trial judge's compass wherever the visibility is poor, we affirm the judgment of the district court.

Early on the morning of January 27, 1960, in heavy fog, a barge in tow of Jahncke's tug Claribel hit a support piling of the Lake Pontchartrain Causeway, 3.4 miles south of the north draw. Two spans of the causeway collapsed. A Winn-Dixie trailer-truck, which happened to be crossing the causeway at the point of impact, was damaged and lost some of its freight. The Greater New Orleans Expressway Commission, owner and operator of the causeway, filed a libel in rem against the Claribel, and a libel in personam against Jahncke. The Commission joined Home Insurance as a defendant under the Louisiana direct action statute.[2] Winn-Dixie also brought a direct action against Home Insurance. February 3, 1960, Jahncke filed a petition seeking exoneration or, alternatively, limitation of liability.[3] Jahncke later withdrew its claim for exoneration, maintaining only the petition for limitation. The limitation proceeding was consolidated for trial with the direct actions. On the day of the trial, Bradford Coleman, the driver of the Winn-Dixie truck, tried to assert a claim against Jahncke for alleged traumatic neurosis. The district court, in a written opinion, (1) denied Jahncke the right to limitation. (2) entered an interlocutory decree holding Jahncke and Home Insurance liable to Winn-Dixie, and (3) dismissed Coleman's claim as barred by prescription and laches. 222 F.Supp. 521.

## I.

The Limitation Act is a seagoing qualification of the doctrine of respondeat superior. Under 46 U.S.C. § 183, the liability of the owner of a vessel "for any loss, damage, or injury by collision * * * incurred, without the privity or knowledge" of the owner shall not exceed the value of the owner's interest in the vessel and its freight. If the owner is chargeable with privity or knowledge, he may not limit.[4] Where, as here, the

---

1. 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806 (1954).

2. LSA–Rev.Stat. 22:655.

3. 46 U.S.C. § 183:
"(a) The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

4. Avera v. Florida Towing Corporation, 5 Cir. 1963, 322 F.2d 155, 166; States Steamship Company v. United States, 9 Cir. 1958, 259 F.2d 458, 466, cert. den'd, 358 U.S. 933, 79 S.Ct. 316, 3 L.Ed.2d 305; The Cleveco, 6 Cir. 1946, 154 F.2d 605, 613.

owner is a corporation, privity or knowledge attributable to management (or those to whom the authority of management has been delegated) binds the corporation.[5] The petitioner in limitation, as the prime mover and the party best able to do so, bears the burden of proving lack of privity or knowledge.[6] But the burden of proving negligence stays with the libellants.[7]

The district court found the Claribel unseaworthy in having neither a properly calibrated compass nor a crew competent to use one. The court charged the Claribel's unseaworthiness to Jahncke, and held that it was a proximate cause of the collision. Jahncke insists that the sole proximate cause was the failure of the Claribel's pilot, one D. C. Brister, to follow standing company instructions to drop anchor in heavy fog.

The evidence shows that the Claribel, pushing a big empty barge, headed north into Lake Pontchartrain from the Industrial Canal at New Orleans about midnight, January 27. Its written orders were to pick up two loads of reef at a dredge on the north shore of the lake and bring them back to one of Jahncke's slips, "weather permitting". To reach the dredge, the Claribel had to pass through the north drawbridge of the causeway, a twenty-four mile concrete bridge running north-south across the center of Lake Pontchartrain. Accordingly, Captain Carver, the ship's master, set out at about seven miles an hour on a compass course of 355 degrees. The afternoon weather report had been favorable. There was a haze over the lake, but no fog. As the tug and its tow left the canal, Captain Carver was relieved at the wheel by the pilot, Brister. Carver's parting instructions were that Brister should call him to help drop anchor if fog should come up.

Brister maintained course and speed. The weather stayed the same until about 1:10 a. m., when pea-soup fog rolled in. Despite instructions, Brister turned his search-light into the fog, reduced speed to about four miles an hour, then turned the light off and "was looking around to see what I could see". Apparently he could not see the causeway; five minutes later he ran into it.

Testimony focused on the accuracy of the Claribel's compass. It appears that the compass had not been checked or calibrated since it was installed in 1956. Electric arc welding, which affects the compass of a steel-hulled vessel, had been used on the Claribel shortly before the accident. In addition, several witnesses testified that the size, position, and number of barges in tow of a tug influence the behavior of its compass. Neither the captain nor the pilot of the Claribel had the slightest understanding of the workings of a compass, or how to compensate for the factors that affect its performance. Jahncke urges that, despite the inaccuracy of the Claribel's compass and the incapacity of its crew, the fact remains that 355 degrees had been shown, over the course of innumerable

5. The Linseed King, 1931, 285 U.S. 502, 509–510, 52 S.Ct. 450, 76 L.Ed. 903; Austerberry v. United States, 6 Cir. 1948, 169 F.2d 583, 594; Great Atlantic & Pacific Tea Co. v. Brasiliero, 2 Cir. 1947, 159 F.2d 661, 664 (and cases cited in n. 3) cert. den'd Republic of the United States v. Great Atlantic & Pacific Tea Co., 331 U.S. 836, 67 S.Ct. 1519, 91 L. Ed. 1849; The Cleveco, supra; The Marguerite, 7 Cir. 1944, 140 F.2d 491, 493; In re Petition of Henry Du Bois' Sons Co., S.D.N.Y.1960, 189 F.Supp. 400, 401–403.

6. Coryell v. Phipps, 1943, 317 U.S. 406, 409, 63 S.Ct. 291, 87 L.Ed. 363; States Steamship Company v. United States, 9 Cir. 1958, 259 F.2d 458, 464, 466, 474; Austerberry v. United States, supra; The E. Madison Hall, 4 Cir. 1944, 140 F.2d 589, 591, cert. den'd; W. E. Valiant Co. v. Rayonier, Inc., 322 U.S. 748, 64 S. Ct. 1159, 88 L.Ed. 1579; The Marguerite, supra, 140 F.2d at 492; The Silver Palm, 9 Cir. 1937, 94 F.2d 776, 777; In re Petition of Henry Du Bois' Sons Co., supra, at 401; Navigacion Castro Riva v. The M. S. Nordholm, E.D.La.1959, 178 F.Supp. 736, 741, aff'd, 287 F.2d 398; In re Eastern Transportation Co., D.C. Md.1929, 37 F.2d 355, 358, modified, The Calvert, 4 Cir. 1931, 51 F.2d 494.

7. See Gilmore and Black, Admiralty, p. 705, n. 3.

trips between the Industrial Canal and the north drawbridge, to be the proper setting *for that particular compass on that particular haul.* Jahncke argues that by starting from the heading of 342-½ degrees (the true course between the Industrial Canal and the north draw); subtracting six degrees (the easterly magnetic "variation" at Lake Pontchartrain); adding seventeen degrees (the westerly "deviation" of the Claribel's compass); and throwing in 1½ degrees for westerly "drift"; we are driven ineluctably to the Claribel's proper compass course of 355 degrees. Petitioner's mathematics are beyond reproach. But they are in no sense proof that the deviation of the Claribel's compass, at that particular time, despite arc welding and the tow, was in fact seventeen degrees. As for the 1½ degrees of "drift", we have found no evidence of it in the record. Furthermore, the fact that on one of three test runs made by Jahncke after the accident the compass course used was 360 degrees (allegedly because of wind), and the fact that Captain Carver admitted that he now runs a course of 358 degrees, cast a long shadow of implausibility over petitioner's theory.

■■ The evidence generously supports the district court's finding that shortcomings of crew and compass were a proximate cause of the accident, though not the sole proximate cause. The more difficult question, as we see it, is whether the standard of care on Lake Pontchartrain requires that a vessel such as the Claribel have an accurate compass and a crew that knows how to use it; or, more properly, whether such a vessel without these accouterments is unseaworthy. Petitioner points out that the Coast Guard does not require tugboat masters on the lake to be licensed navigators. The record indicates that masters who understand even the rudiments of compass compensation are the exception rather than the rule. The evidence justifies, indeed requires, an

inference that practices regarding compass repair and calibration are casual on those waters, possibly because most navigation on Lake Pontchartrain is done by dead reckoning, when visibility is good. But the evidence also establishes that visibility is often not good. Lake Pontchartrain is large and shallow, subject to sudden weather changes, treacherous squalls, and frequent fog. Commercial traffic is heavy, and the barges that ply the lake are big and unwieldy. Petitioner's own compass expert, Mr. Irwin Williams, testified that anyone who navigates on Lake Pontchartrain should have a "proper compass" and should understand how to use it. Libellants' expert, Captain E. R. Vorenkamp, said that, in his opinion, people operating tugs on the lake should have more or less the qualifications required of offshore navigators, and should certainly know how to check a compass for changes in deviation.[8] In light of this testimony, we cannot say that the district court's finding of unseaworthiness is unwarranted, despite the laxity of prevailing custom on Lake Pontchartrain. Usage is not, and should not be, an inevitable standard. Judge Learned Hand put the proposition sharply:

> "There are, no doubt, cases where courts seem to make the general practice of the calling the standard of proper diligence; we have indeed given some currency to the notion ourselves. [citations omitted.] Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission." The T. J. Hooper, 2 Cir.1932, 60 F.2d 737, 740,

---

8. The master of the Claribel had an ideal opportunity to check the deviation on each haul, as Williams testified, because the tug, to get to the lake from its slip, had to pass through the Industrial Canal, of fixed and known direction.

cert. den'd, Eastern Transportation Company v. Northern Barge Corporation, 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571.[9]

The unseaworthiness of the Claribel is attributable to Jahncke's marine superintendent, Nunez. Nunez was responsible for the maintenance of Jahncke's vessels and for the hiring and firing of marine personnel. The district court properly held that "[a] marine superintendent is a managing officer whose privity or knowledge is chargeable to the corporation." 222 F.Supp. at 525.[10]

## II.

Home Insurance sets up two defenses to the direct actions. It argues first that direct action is precluded where limitation is at issue; second it asserts that the policy issued to Jahncke is excluded by statute from the application of the Louisiana Insurance Code, and hence from direct action.

The question of whether direct action may coexist with limitation is one on which the Supreme Court ran aground in Maryland Casualty Company v. Cushing, 1954, 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806. The Court was of three minds: four Justices[11] thought direct action repugnant to the policies of the Limitation Act, and not to be allowed at all where limitation is at issue. To another four,[12] the two proceedings were in no way incompatible. And the remaining member[13] of the Court thought that the direct action should simply be stayed until conclusion of the limitation proceeding, so that the shipowner's insurance proceeds would not be exhausted before limitation. The first four acquiesced in this solution "to break the deadlock". "Because of the Court's extraordinary division, it is impossible to say what the Cushing case stands for, beyond the fact that it presumably established a procedure to be followed by lower courts in handling similar cases until the Supreme Court further clarifies the issues."[14] Here, because the two proceedings were consolidated, the direct action was in effect stayed until the conclusion of the limitation proceeding. Denial of limitation renders the question retrospectively moot anyway. It also enables us to steer clear of the problem of whether, as a matter of Louisiana law, Home Insurance is entitled to the benefits of Jahncke's right to limit.

Cushing circumnavigated, we turn to the Louisiana statute. LSA–Rev. Stat. 22:611 provides that the Louisiana Insurance Code "shall apply to insurances other than ocean marine and foreign trade insurances." The district court, however, held that the policy issued to Jahncke, although a policy of hull insurance, was also a public liability policy, subject to the Code, and therefore to the direct action statute. The policy insured Jahncke against liability for personal injury or property damage caused by the Claribel. The direct action stat-

9. See also Texas & Pacific Railway Co. v. Behymer, 1903, 189 U.S. 468, 470, 23 S.Ct. 622, 47 L.Ed. 905; Pure Oil Co. v. Snipes, 5 Cir. 1961, 293 F.2d 60, 71; Kane v. Branch Motor Express Co., 2 Cir. 1961, 290 F.2d 503, 507; June T., Inc. v. King, 5 Cir. 1961, 290 F.2d 404, 406; Schlichter v. Port Arthur Towing Company, 5 Cir. 1961, 288 F.2d 801, 804 (dictum); Santomarco v. United States, 2 Cir. 1960, 277 F.2d 255, 257, cert. den'd, American Stevedores v. United States, 364 U.S. 823, 81 S.Ct. 59, 5 L. Ed.2d 52; Troupe v. Chicago D. & G. Bay Transit Co., 2 Cir., 1956, 234 F.2d 253, 260; Prosser, Torts, 3rd ed. p. 170.

10. See The Cleveco, supra; In re Petition of Henry Du Bois's Sons Col, supra; The Erie Lighter 108, D.C.N.J.1918, 250 F. 490, 494; cf. New York & Cuba Mail S.S. Co. v. Continental Ins. Co., 2 Cir. 1941, 117 F.2d 404, 407–408, cert. den'd 313 U.S. 580, 61 S.Ct. 1103, 85 L.Ed. 1537.

11. Justice Frankfurter, with Justices Reed, Jackson, and Burton.

12. Justice Black, with Chief Justice Warren, and Justices Douglas and Minton.

13. Justice Clark.

14. Gilmore and Black, Admiralty p. 715; see Tokio Marine & Fire Insurance Company v. Aetna Casualty & Surety Company, 5 Cir. 1963, 322 F.2d 113.

ute, by its terms, applies to every "policy or contract of liability insurance." Though historically no love has been lost between the direct action statute and the Fifth Circuit, we resist the temptation to manacle an old and now beaten enemy.[15] "There is no indication in Sec. 655 that the Louisiana legislature intended to deny the right of direct action to persons covered by marine policies, while extending it to all others." Cushing v. Maryland Cas. Co., 5 Cir.1952, 198 F.2d 536, 538, reh. den'd 198 F.2d 1021, reversed on other grounds, Maryland Casualty Company v. Cushing, supra. See also Lovless v. Employers' Liability Assurance Corporation, 5 Cir.1955, 218 F. 2d 714

### III.

■ Finally, there is the appeal of Bradford Coleman, driver of the Winn-Dixie truck: April 7, 1960, the district court, having earlier enjoined all claims against Jahncke or Home Insurance Company except those timely filed in the consolidated proceeding, entered an order noting the default of all persons who had not filed claims in connection with the collision of January 27. February 7, 1962, the court relaxed its injunction to permit Coleman to file a direct action against Home Insurance. Coleman never filed the direct action, but on the first day of the trial, April 1, 1963, he moved for permission to assert his defaulted claim against Jahncke in the limitation proceeding. Attached to the motion was a letter from a psychiatrist stating that Coleman was of "borderline intelligence" and had been mentally incompetent to assert his claim. The district court, without ruling on the motion, let Coleman participate in the trial. Coleman's lawyer argued his motion, but Coleman did not appear. The court, noting that tort actions in Louisiana prescribe in one year,[16] found that Coleman had not

excused his delay, and that Jahncke had been "seriously prejudiced" by Coleman's laches. The court's holding that Coleman's claim is barred seems to us appropriate in fact and in law.

The judgment of the district court is affirmed.

---

15. A 1964 amendment to 28 U.S.C. § 1332 provides that, for purposes of federal jurisdiction, an insurer defendant in a direct action (filed after August 14, 1964) is to be attributed with the State citizenship of its insured. The amendment

will keep from the federal docket a raft of cases, jurisdiction over which would have been "conferred" on the federal courts by the Louisiana legislature.

16. LSA–Civil Code, Arts. 3536 and 3537.