**ALCOA STEAMSHIP COMPANY, Inc.,**
Libellant,

v.

**CHARLES FERRAN & COMPANY, Inc.,**
et al., Respondents.

Adm. No. 3390–B.

United States District Court
E. D. Louisiana,
New Orleans Division.

March 2, 1966.

Joseph M. Rault, Benjamin W. Yancey, Edward S. Bagley, Francis Emmett and Terriberry, Rault, Carroll, Yancey & Farrell, New Orleans, La., for libellant, Alcoa S. S. Co., Inc.

George B. Matthews, George A. Frilot, III, and Lemle & Kelleher, New Orleans, La., for respondents Charles Ferran & Co., Inc., and others.

Leon Sarpy, James G. Burke, Jr., and Chaffe, McCall, Phillips, Burke, Toler & Hopkins, New Orleans, La., for other respondent insurers.

FRANK B. ELLIS, District Judge.

On October 6, 1956, a devastating oil-fed blaze aboard the SS ALCOA CORSAIR gutted a major portion of the vessel's engine spaces, killed one man and left another badly burned. The owner of the vessel, Alcoa Steamship Company, Inc. (Alcoa) then instituted this million dollar libel for damages against the ship's repairers, Charles Ferran & Company, Inc. (Ferran), and against Ferran's insurers. Ferran had just a few hours earlier completed rebricking the starboard boiler. The parties, reserving the determination of the quantum of damages for a later date, tried the questions of liability to the Court without a jury, and on April 22, 1965, this court filed written findings of fact and conclusions of law. Alcoa Steamship Company, Inc. v. Charles Ferran & Company, Inc., 242 F.Supp. 962–975 (E.D.La.1965). In brief this Court held:

1) That the "Red Letter" clause uniformly inserted in all prior Ferran-Alcoa repair contracts limiting Ferran's liability *vis-a-vis* Alcoa to $300,000.00 was binding and enforceable;

2) That Ferran's negligence in improperly re-connecting the dropline which supplied pre-heated oil to the starboard boiler through the #3 burner register was the proximate cause of the fire's inception; and

3) That the negligent acts of Alcoa and the unseaworthy condition of the CORSAIR warrant application of the

"avoidable consequences" doctrine and an ultimate apportionment of the total damages.

None of the parties being satisfied, motions for rehearing and for supplemental and amended findings of fact and conclusions of law were filed, followed by oral argument.

a) *Prior findings of fact.*

At the outset of this consideration, a skeleton restatement of the original fact findings is appropriate. The CORSAIR is an oil burning, steam-driven, single screw, modified Victory Ship constructed in 1947. Its oil is pre-heated to 230 degrees Fahrenheit and piped through droplines into the four burner registers on each of the two boilers where the oil is then mixed with air and ignited to heat the boiler, produce steam and turn the propellor. Ferran removed the #3 register on the starboard boiler to rebrick the inside and, in re-attaching the dropline to the register after finishing the work inside the boiler, one of Ferran's employees re-engaged the female fitting on the #3 dropline with the corresponding male fitting "whose threads were worn, and/or may have been stripped or in a cross-threaded state." 242 F.Supp. at 968. This was shortly after 9:30 P.M. the night of October 5th.

At about 4:35 A. M. the morning of October 6th, the CORSAIR'S Fireman, Thomas C. Deale, after having re-circulated the oil to build up pressure and raise its temperature to 230 degrees, opened the valve above the defective coupling with his one hand and was sprayed with superheated oil under pressure. Instinctively falling backwards, the lighting torch which he had been holding to the register's peephole ignited the uncontrolled flow of oil and sparked the holocaust that followed. The rapidly expanding inferno separated Deale from the "quick shut-off valve" which, had it been reached and closed, would have minimized the damages. And Deale's heroic efforts to reach the settling valve, a remote fuel oil system control, were thwarted by a locked door on the $CO_2$ room through which he would have had to pass. No one else aboard the ship at the time knew how or where to cut off, by use of remote controls, the flow of oil that continued to feed the fire. The CORSAIR'S Chief Engineer, Mr. Lemon, was summoned, but it was not until about 5 A.M. that he finally succeeded in his efforts to cut off the flow of fuel oil feeding the fire.

b) *Ferran's negligence.*

■ We remain unswayed by Ferran's continued arguments that the blaze's beginning did not result from negligence attributable to Ferran. As set forth at length in our original opinion, the physical facts, supported by testimony from some of the witnesses, leads "to the inescapable conclusion that this fire had its inception when the male and female components of the valve parted," the same components that Ferran had a few hours earlier re-connected.[1]

c) *Applicability of "Red Letter" clause.*

■ Equally unpersuasive is Alcoa's argument, incorporated only by reference in its original memorandum on rehearing, that the "Red Letter" clause, purporting to limit Ferran's liability to $300,000.00, was not a part of the contract ostensibly completed just prior to the fire. The common practice between these parties, not their explicit words prior to the fire, belied the true relationship.

> "Usages and customs may be proved * * * to affect the contractual relations of the parties by adding a provision to the contract that the words of the parties can scarcely be said to have expressed." 3 Corbin on Contracts, § 556, p. 240 (1960 Ed.)

The Ferran-Alcoa repair contract relationship is explained in 242 F.Supp. at 965–966. We therefore re-affirm the findings that the "Red Letter" clause formed part of the contract at issue.

d) *Validity of "Red Letter" clause.*

The next step, not fully developed in the original opinion, is whether the "Red

---

1. See especially, 242 F.Supp. at 972.

Letter" clause, limiting Ferran's liability, stands invalid as against public policy. This mutually agreed upon clause purports to relieve Ferran from liability for damages in excess of $300,000.00, caused by Ferran's own negligence or breach of contract.[2] In Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955) the negligent towage by those operating the Tug Cairo caused the oil barge Bisso to collide with a bridge pier and sink. The Tug owners had exacted a "release-from-liability-clause" from the barge interests as part of the towage contract. In effect, the release clause purported to relieve the tug owners from *all* liability for their own negligence. The Supreme Court invalidated the release clause for two main reasons:

> "(1) to discourage negligence by making wrongdoers pay damages, and (2) to protect those in need of goods or services from being overreached by others who have power to drive hard bargains." 349 U.S. at 91, 75 S.Ct. at 632.

Briefly stated, the Court in Bisso held "that tow and tug may not by agreement relieve the tug of liability for damage to the tow caused by the tug's negligence."[3]

Alcoa here attempts to analogize its position with the Bisso holding by parodying "that ship and repairer may not by agreement relieve the repairman of liability for damage to the ship caused by the repairman's negligence." The whole tenor of the majority opinion in Bisso, however, as well as the dissenters' analysis of the majority hold-

ing, fails to adequately support Alcoa's argument. Significant factual differences exist. First, while relief from all liability for negligence might not discourage negligence, potential responsibility for $300,000.00 in damages would have the effect of discouraging negligence. Under the "Red Letter" clause Ferran remains responsible for a substantial amount of damages. Secondly, it is the general rule of contracts that "with certain exceptions the courts see no harm in express agreements limiting the damages to be recovered for breach of contract."[4] The "exceptions" referred to involve, generally, contracts of the adhesion-type wherein the bargaining power of one party is extremely restricted to the point where countenancing the limitation becomes unconscionable. When a limitation does not result from inequality of bargaining power, the courts prefer to let parties lie on the bed they make.[5]

In *Bisso* the Supreme Court ruled that contracts releasing a tug or its owners from all liability are, "based on public policy," invalid,[6] and emphasized the powerful bargaining position enjoyed by tugs when dealing with barge owners.[7] Similarly leashed are common carriers,[8] employers,[9] and manufacturers or dealers in a position to utilize adhesion contracts.[10] In sharp contradistinction stands the situation where the bargaining power of the parties approximates equality.[11] Alcoa has not proven that Ferran held a severely imbalanced upper hand.[12] Nor was evidence produced to show that all ship repairers', or all Ferran company contracts with all vessel

---

2. The "Red Letter" clause is set forth in full at 242 F.Supp. 965.

3. 349 U.S. at 98, 75 S.Ct. at 637; Mr. Justice Frankfurter, joined by Mr. Justice Reed and Mr. Justice Burton, dissenting.

4. 5 Corbin on Contracts, § 1068, p. 386 (1960 Ed.)

5. Ibid.

6. 349 U.S. at 90, 75 S.Ct. 629.

7. Id. at 89, 75 S.Ct. 629.

8. 6A Corbin on Contracts, § 1472, p. 592 (1960 Ed.).

9. Id. at 598.

10. Id. at 599, citing Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1 (1960).

11. Id. at 601–602: "One who employs another to install machinery and equipment can lawfully agree to exempt him from liability for negligence in the process."

12. See Bisso, 349 U.S. at 117–121, 75 S.Ct. 629, Frankfurter, J., dissenting.

owners included a $300,000.00 limitation clause. In fact, the Ferran-Alcoa contract for post-fire repairs to the COR-SAIR expressly excluded the "Red Letter" clause. Consequently, under the circumstances, this court does not consider Ferran's limiting of its liability to $300,000.00 to be unconscionable, and hence concludes that the clause is valid. See Sun Oil Co. v. Dalzell Towing Co., 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311 (1932).

e) *Applicability of the "Red Letter" clause to Alcoa's Direct Action against Ferran's insurers.*

In addition to its action against Ferran, Alcoa sued Ferran's insurers pursuant to the Louisiana Direct Action Statute, LSA–Rev.Stat. 22:655. This Statute creates a cause of action in favor of persons injured in Louisiana which can be asserted directly against the public liability carrier of a tortfeasor, regardless of the tortfeasor's joinder in the suit. While there exists respectable authority for the proposition that suits solely *ex contractu* are not cognizable within the Direct Action Statute,[13] we need not resolve that issue here.

A mere reading of libellant's petition makes it evident that libellant seeks recovery both in contract and in tort. See Newport News Shipbuilding & Drydock Co. v. United States, 226 F.2d 137 (4th Cir. 1955). This Court's finding of tortious negligence on the part of Ferran supports the Direct Action against Ferran's insurers.

From the outset, though, Ferran's insurers have contended that they stand in the same shoes as does Ferran, especially with respect to the "Red Letter" clause's $300,000.00 limitation on liability. The issue received little attention until this court, virtually contemporaneously with rendition of the initial opinion

in the present case, announced its decision in the *ITCO* case, In the Matter of Independent Towing Company, Inc., 242 F.Supp. 950 (E.D.La.1965).[14] There we held that the "Limitation of Vessel Owner's Liability" provisions, originally enacted by Congress in 1851,[15] created a defense to actions asserted by injured persons against vessel owners, but did not inure to the benefit of the vessel owner's insurers or the vessel's underwriters since such provisions were traditionally considered a defense personal to the vessel interests and of the type generally denied insurers by Louisiana courts. See *ITCO*, 242 F.Supp. at 954.

The *ITCO* decision built upon one corner of the Supreme Court's ruling in Maryland Casualty Co. v. Cushing, 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806 (1954). In *Cushing*, the issue faced by the Court involved the compatability of the Louisiana Direct Action Statute and the same congressionally enacted limitation provisions. Under the procedural circumstances of that litigation, wherein direct actions and a limitation proceeding were pending simultaneously, but were not consolidated, Justices Frankfurter, Reed, Jackson and Burton concluded that the "direct action statute clashes with the federal system for marshalling all claims arising from certain maritime causes of action," 347 U.S. at 415, 74 S.Ct. at 611, for two reasons, one being that permitting separate judgments "would detract from the benefit of a *concursus* and undermine the operation of the congressional scheme for the 'complete and just disposition of a many cornered controversy.'", 347 U.S. at 416–417, 74 S.Ct. at 612 and the other being that "[r]espect for the [federal limitation] Act precludes allowance of litigation, based on a State statute, which carries the potentiality of irreparable infringement upon federal law," 347 U.S. at 421, 74 S.Ct. at 615.

---

13. Pennsylvania Fire Ins. Co. v. Underwriters at Lloyds' London, La.App., 140 So.2d 212 (4 Cir. 1962), cert. den. June 15, 1962; C. A. Mackey & Co., Inc. v. SS Slagen, Admiralty No. 4036, U.S.D.C., E.D.La., October 31, 1962.

14. The *ITCO* case was settled prior to trial on the merits, without appeal.

15. 9 Stat. 635; now 46 U.S.C.A. § 181 et seq.

828

Four other members of the Court, Chief Justice Warren and Justices Black, Douglas and Minton, were of the opinion that "[n]o language in the Limited Liability Act forbids" recognition and support of the Louisiana policy of protecting people within its borders by permitting prosecution of actions directly against a tortfeasor's insurer. 347 U.S. at 438, 74 S.Ct. at 623. The remaining member of the Court, Mr. Justice Clark, proposed to accord recognition to both statutes, the federal limitation act by protecting first the "owner's purse", and the state direct action by then permitting the claimants to prosecute "the direct actions against the insurance companies on the remaining coverage of the policies." 347 U.S. at 425, 74 S.Ct. at 617.

In so stating his position, Mr. Justice Clark created two majority decisions in one case. On the one hand, by concluding *inter alia* that "limitation" and "direct action" could co-exist, he joined Chief Justice Warren and Justices Black, Douglas and Minton in holding that the Louisiana Direct Action Statute did not invariably or irreconcilably conflict with the federal limitation scheme—the *substantive* question. On the other hand, by expressly stating that the limitation proceeding should be concluded prior to a determination of the direct actions, 347 U.S. at 427, 74 S.Ct. 608, he was joined by Justices Frankfurter, Reed, Jackson and Burton in establishing the sequence in which the two would be determined—the *procedural* question. 347 U.S. at 423, 74 S.Ct. 608.

At the time the *Cushing* decision was announced, the posture of that case and its related lawsuits was such that issuance of a stay order was equitably necessary to effectuate the procedural majority's holding. In practice, application of the principles stated in the *Cushing* case became difficult, if not impossible. See Gilmore and Black, Admiralty, § 10–31, p. 715 (1957 ed.); and Ex parte Tokio Marine & Fire Insurance Co., 322 F.2d 113 (5th Cir. 1963). One problem appears to be whether the "substantive majority" exists at all. In Coleman v. Jahncke Service, Inc., 341 F.2d 956 (5th Cir. 1965), certiorari denied Jahncke Service, Inc. v. Greater New Orleans Expressway Comm., 86 S.Ct. 538 (1966), the Court recognized this substantive problem but "circumnavigated" it. See 341 F.2d at 960.

Gilmore and Black concluded that the *Cushing* case "presumably establishes a procedure to be followed by lower courts in handling *similar cases* until the Supreme Court further clarifies the issues."[16] The practice has since developed that all vessel owners praying for limitation of liability under the federal act consider themselves to be involved in "similar cases" and therefore mechanically request a broad injunction or restraining order prohibiting the filing and prosecution of actions against themselves, their insurers, vessels and underwriters. In effect, vessel owners read *Cushing* as establishing an inflexible procedural rule: no direct action until limitation is terminated. Such a reading of course guarantees a concursus in all limitation-related proceedings, but at the same time this inflexible procedural rule denies injured claimants their right of direct action in part by delaying the filing and prosecution of the direct action. In the Eastern District of Louisiana where the largest caseload per judgeship exists, and the average delay from filing to trial approximates three years, this means that direct action-limitation claimants can anticipate an even longer delay since their state-created right cannot even be filed until the limitation proceeding is terminated. But is the procedural majority's rule so inflexible? We submitted in the *ITCO* decision that it is not, and there enumerated several situations, where the recognition and prosecution of direct action rights concurrently with the limitation proceeding would not impinge on the substantive rights created by the federal limitation act. See 242 F.Supp. at 956. We concluded, in short,

16. Gilmore and Black, Admiralty, § 10–31, p. 715 (1957 Ed.).

that the procedural majority's rule of limitation-before-direct-action should be invoked only in those situations where a substantive limitation right might be irretrievably lost; the *Cushing* case's procedural majority rule need not be mechanically and automatically applied in all limitation-direct action situations. We consider this an equitable rule of reason, and cannot countenance any conclusion that the procedural rule announced in *Cushing,* which was certainly an equitable result under the circumstances of that litigation, would produce an inflexible rule and oftentimes inequitable result. When there can arise no infringement of a federally protected right, the Ninth [17] and Tenth [18] amendments to the Constitution of the United States require recognition and protection of a state-created right, here the right of an injured party to a direct action against the tortfeasor's insurer.[19]

One recent application of the *ITCO* decision's procedural rule of reason illustrates its practical flexibility. In Singer v. Dorr, 38 F.R.D. 167 (E.D.La. 1965), a widow sued for damages resulting from the wrongful death of her deckhand husband who fell overboard and drowned in the Mississippi River. The suit named both the decedent's employer and its insurer as defendants.

Limitation of Liability pursuant to the federal statute was asserted in the answer as a special defense. Relying on the *ITCO* decision, and exercising its discretion under Rule 42(b),[20] a discretion that would be absolutely precluded if the *Cushing* "procedural majority" were uniformly invoked in all situations, this court ordered a separate trial of the limitation of liability issues to take place subsequent to trial of the other issues. The expectation that trial of the limitation issues would be unnecessary came to realization when the jury found for plaintiff in an amount well within policy limits.

In a sense, the *ITCO* decision presupposes the existence of the *Cushing* "substantive majority." Chief Justice Warren and Justices Black, Douglas and Minton clearly refuted the insurance companies' constitutional objections urged against the Louisiana public policy as expressed in its Direct Action statute. The opening sentence of Justice Clark's concurring opinion indicates that he perceived "no necessity for invalidating Louisiana's law by dismissing these direct actions." 347 U.S. at 423, 74 S.Ct. at 615. He later stated that "[w]hen the issue is so close, I would resolve it in favor of upholding rather than invalidating a state statute," and concluded

17. "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

18. "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

19. For direct actions to be permitted at all, the cause of action must have arisen within the borders of a state permitting direct actions. See Guess v. Read, 290 F.2d 622 (5 Cir. 1961). The theoretical situation posed in Cushing where twenty people from twenty different states are injured by a large wave is, at best, a remote possibility within the borders of the two states presently recognizing direct actions, Louisiana and Wisconsin. Far more common are situations where one deckhand falls overboard from a barge on the Mississippi River, or a master is trapped in the wheelhouse of a capsized tug, or a local workman is injured when a barge being repaired explodes, or a tug and tow strikes the Lake Pontchartrain Causeway. State court direct actions in other states, if not precluded by local public policy, would in most instances be susceptible to removal and once in federal court transferable, for the convenience of the parties and the witnesses, to the district wherein the limitation proceeding is pending so that consolidation may be effected. The insurers would bear the responsibility for effecting this total consolidation. Whenever total consolidation could not, for some reason, be effected, the limitation court could, in aid of its jurisdiction, at that point enjoin other actions rather than doing so at the outset. See 28 U.S.C.A. § 2283 and Ex parte Tokio Marine and Fire Ins. Co., 322 F.2d 113 (5th Cir. 1963).

20. F.R.Civ.P., 28 U.S.C.A.

with the observation that the claimants could assert their substantive direct action rights after the limitation proceedings were concluded. 347 U.S. at 426–427, 74 S.Ct. at 617. Justice Clark's attention was focused on making certain "that such [direct] actions do not interfere with the Federal Limitation proceeding." 347 U.S. at 425, 74 S.Ct. at 616. We carefully note here that, based on these excerpts, Justice Clark did not consider the Louisiana Direct Action Statute a *per se* infringement of the federal admiralty jurisdiction. In this sense he created the "substantive majority" by declaring the Direct Action statute applicable in admiralty. Only when the application of that statute in the admiralty jurisdiction procedurally interfered with the federal limitation proceeding, as it did in the precise nature of the *Cushing* situation, would Justice Clark stay the direct action. Consequently, we hold that the "substantive majority" rule of *Cushing* does, in fact, exist, precluding the filing or prosecution of direct actions, or the execution of a judgment secured through a direct action, only when the direct action unreasonably interferes with the limitation proceeding.

So stated, recognition of the *Cushing* "substantive majority" lends further support to the proposition, if only by negative inference, that the "procedural majority" rule was not intended to be inflexible. Lack of interference with the limitation proceeding would permit concurrent prosecution of the direct action.

Interestingly, counsel for Alcoa subscribe to the *ITCO* rationale and in fact echo that decision's holding as legal authority for the proposition "that the 'red letter' clause does not extend in favor of the Ferran liability insurers and that the latter are liable without limitation herein." [21] While it is true that insurers were denied the benefits of statutory fed-eral *limitation of liability* in *ITCO*, it does not automatically follow that insurers should also be denied the benefits of a contractual *limitation of liability* here. The similarities may only be superficial. Since the McCarran Act, 59 Stat. 33–34, 15 U.S.C.A. § 1011 et seq., prohibits federal regulation of the "business of insurance" and expressly reserves such regulation to "the several States," [22] we turn to the law of Louisiana for the legal principles on which to base our resolution of the issue here presented.

■ Under the Louisiana Direct Action Statute, a tortfeasor and the tortfeasor's insurer are considered codebtors *in solido,* each liable for the full amount of damages suffered by an injured party. The defenses which may be asserted by each codebtor *in solido* are established by the Louisiana Civil Code:

> "Art. 2098. A codebtor *in solido,* being sued by the creditor, may plead all the exceptions resulting from the nature of the obligation, and all such as are personal to himself, as well as such as are common to all the codebtors.
>
> "He can not plead such exceptions as are merely personal to some of the other codebtors."

This codal article permits an insurer to assert three types of defenses:

(1) Those resulting from the nature of the obligation;

(2) Those which are personal to the insurer; and

(3) Those which are common to all the codebtors;

but prevents the insurer from asserting as a defense one which is merely personal to another codebtor.

In the *ITCO* decision we referred to numerous examples of defenses which

---

21. Libellant's Memorandum in Support of Motion For Rehearing and for Supple-·mental and amended Findings of Fact and Conclusions of Law, p. 37.

22. See Maryland Casualty Co. v. Cushing, 347 U.S. 409, 436–437, 74 S.Ct. 608, 98 L.Ed. 806 (1954); and Coleman v. Jahncke Service, Inc., 341 F.2d 956, 960–961 (5 Cir. 1956), cert. denied, Jahncke Service, Inc. v. Greater New Orleans Expressway Comm., 86 S.Ct. 538 (1966).

are considered "personal" under Louisiana law, and hence defenses which cannot be asserted by a tortfeasor's insurer. These defenses included infancy, LSA–Rev.Stat. 9:571 and Rouley v. State Farm Mutual Automobile Ins. Co., 235 F.Supp. 786, 793 (W.D.La.1964); coverture, Edwards v. Royal Indemnity Co., 182 La. 171, 161 So. 191 (1935) and Dumas v. United States Fidelity & Guaranty Co., 241 La. 1096, 134 So.2d 45, 50 (1961); charitable immunity, Lusk v. United States Fidelity & Guaranty Co., La.App., 199 So. 666 (Orleans 1941); and governmental immunity, Brooks v. Bass, La. App., 184 So. 222 (Orleans 1938), certiorari denied, November 28, 1938. As succinctly stated in Simmons v. Clark, La.App., 64 So.2d 520 (1 Cir. 1953), "[p]ersonal defenses are such as infancy, interdiction, coverture, lunacy, bankruptcy and the like." 64 So.2d at 523. In ITCO we merely added to this list "vessel owners who assert their federally created right of limitation of liability."

Amongst these apparently varied "personal" defenses, one common denominator is discernible—each person possessing a "personal" defense obtained that defense because the law granted it to all members of his class as a matter of public policy. The personal defense attaches to the status. Hence parents, children, husbands, wives, governmental units, charitable organizations, bankrupts, lunatics, interdicts, vessel owners, and the like possess a defense denied their respective insurers.

■ On the other hand, insurers may assert defenses which result from the nature of the obligation—contributory negligence, assumption of risk, confusion, collateral estoppel, and res judicata, for example, as well as those common to all codebtors. In tort actions, most conceivable defenses common to all codebtors will arise from the nature of the obligation. Additionally, insurers enjoy and frequently assert defenses personal to themselves, such as coverage, policy limits, and procurement by misstatement of material facts in the application. Not having been mentioned in the "Red Letter" clause, Ferran's insurers cannot claim the limitation provision therein as their personal defense. The defense asserted here by Ferran stems from the repair contract which established the relative rights and obligations between Ferran and Alcoa. Ferran breached its duty and thereby became obligated to Alcoa. But the agreement between these two parties stated that Ferran's obligation would not exceed $300,000.00. This limitation of liability constitutes a defense resulting from the nature of the obligation within the plain meaning of Article 2098. Here the size of the obligation was part of the obligation. No codal article, no statute, no jurisprudential rule grants ship repairers any given immunity or limitation merely because of their status as ship repairers. The public policy favoring infants, interdicts, wives, lunatics, bankrupts, vessel owners and the like has not been extended to ship repairers.

We therefore conclude that the "Red Letter" clause's limitation of liability provisions constituted part of the obligation and created a defense inuring to the benefit of Ferran's insurers as contemplated by Louisiana Civil Code Article 2098. To hold otherwise would effectively nullify practically all liability limitations contained on coat and hat checks, parking garage stubs, automotive and other consumer goods guarantees, and a myriad of similar contractual agreements. Insurers are not entitled to benefit from a defense based on the insured's publicly protected legal status, but should benefit from the contractual defenses of their insured.

f) *Avoidable Consequences Doctrine.*

In our original opinion certain instances of conduct and conditions attributable to Alcoa, and Southport Transit Co. v. Avondale Marine Ways, Inc., 234 F.2d 947 (5 Cir. 1956), were relied upon as authority for invocation of the "Avoidable Consequences" doctrine. These instances included the location of

the quick shut-off valve in relation to the boilers, the uncontrolled ventilating system, the locked $CO_2$ room, the crew's unfamiliarity with the location of remote control devices, and the opened passageway doors.[23] Counsel for Alcoa urges numerous legal arguments in support of their contention that the "Avoidable Consequences" doctrine is here inapplicable. Several of Alcoa's arguments, but not all, are well founded.

Considering initially Alcoa's argument that the "Avoidable Consequences" doctrine does not apply to conditions or conduct attributable to Alcoa which preceded Ferran's negligence, we are constrained to agree. This Court held that the fire was started solely through Ferran's negligence, and not by Alcoa's negligence or the CORSAIR'S unseaworthiness, that is, not by the shut-off valve's location, nor by the ventilators, nor by the locked $CO_2$ room, nor by the CORSAIR'S crew, nor by the open doors. Ferran cannot be heard to complain that these conditions existed since a tortfeasor is considered to take his victim as he finds him.[24] The tortfeasor is only responsible, however, for those damages which proximately result from his negligent conduct.

The "Avoidable Consequences" doctrine denominates a corollary to this general rule of damages wherein an injured party is required to exert reasonable efforts to minimize the extent of his damages after he has been tortiously injured. Irrespective of the variable conceptual explanations supporting the "Avoidable Consequences" doctrine the Fifth Circuit Court of Appeals in Southport Transit Co. v. Avondale Marine Ways, Inc., 234 F.2d 947 (1956), adopted the rationale espoused in the Restatement:

> "[A] person injured by the tort of another is not entitled to recover damages for such harm as he could have avoided by the use of due care after the commission of the tort." Restatement of Torts, § 918.

As a result, Alcoa was obliged to exercise due care after the commission of the tort to mitigate its damages, failing which, Alcoa would be precluded from recovering that portion of its damages resulting from its lack of due care.[25]

Alcoa cannot sit back without taking timely action and then attempt to escape the obligation to exercise due care in avoiding damages by relying on insurance coverage or an indemnity situation arising from a breach of the repair contract. Even though Alcoa might, in some circumstances, be entitled to full indemnity when Ferran breaches its warranty of workmanlike service, where possible, Alcoa must still exercise due care to mitigate its damages. "[P]ublic policy requires that persons should be discouraged from wasting their resources both physical or economic." Restatement of Torts, § 918, p. 602; Southport Transit Co. v. Avondale Marine Ways, Inc., 234 F.2d 947, 954 (5 Cir. 1956). See also Restatement of Torts, § 918, especially Illustration 7 at pp. 604–605. It therefore becomes necessary to determine whether Alcoa's action subsequent to the negligence of Ferran constituted a failure to make reasonable efforts towards diminishing its damages.

As the Fifth Circuit clearly recognized in the *Southport Transit* case, applicability *vel non* of the "Avoidable Conse-

---

23. See 242 F.Supp. at 974.

24. "The negligent actor is subject to liability for harm to another although a physical condition of the other which is neither known nor should be known to the actor makes the injury greater than that which the actor as a reasonable man should have foreseen as a probable result of his conduct." Restatement of Torts 2d, § 461.

25. The test used in applying the avoidable consequences doctrine is one of "due care". Hence, even assuming arguendo that Alcoa owed its ship's repairer, Ferran, the warranty of seaworthiness, unseaworthiness would be irrelevant since it involves liability regardless of due care.

quences" doctrine is a *question of damages,* not one of liability. See 234 F.2d at 954. At the start of the trial in this matter, the parties, by stipulation, reserved determination of quantum of damages and tried only the question of liability. The facts presented during the trial concerned, for the most part, only liability. From the present state of this record, facts relating to possible reduction of any damage award due to Alcoa's failure to mitigate such damages were not presented with sufficient particularity to support a finding, one way or the other. We here merely note that the "Avoidable Consequences" doctrine, or some other rule of damages, may be applicable. Conversely, the facts may indicate that all of the damages were causally related only to Ferran's initial negligence.

As part of the original stipulation that determination of damages would be deferred, it was understood by the parties and the Court that if within a reasonable time after the liability issues were resolved by this court, no agreement as to quantum of damages was reached, a Special Master would be appointed to decide the damages question. Therefore,

It is ordered that Richard B. Montgomery, Esq., 806 National Bank of Commerce Bldg., New Orleans, La., 70112, be and he is hereby appointed Special Master to hear and determine the question of damages in this action including the question of the total damages resulting from the fire aboard the S. S. ALCOA CORSAIR on October 6, 1956, the question of the failure, if any, of Alcoa, its agents or employees to exercise due care in diminishing Alcoa's damages, and the question of the rule of damages to be applied in this case; this appointment is subject to the condition that it will be automatically terminated, without cost to the parties or fees to the Special Master, if within thirty (30) days from date hereof the parties shall notify the Court and the Special Master that they have agreed, stipulated, or compromised all questions of damages referred to or referable to the Special Master.